## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| OVERWELL HARVEST LIMITED,<br>a British Virgin Islands company,<br>individually and derivatively on<br>on behalf of NEURENSIC, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:17-cv-06086 |
| v. | ) ) | Honorable Sara L. Ellis |
| DAVID WIDERHORN and<br>PAUL GIEDRAITIS, | ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiff Overwell Harvest Limited ("Overwell" or "Overwell Harvest"), by and through its undersigned counsel, pursuant to and in accordance with the Federal Rules of Civil Procedures, for its amended complaint against Defendants David Widerhorn ("Widerhorn") and Paul Giedraitis ("Giedraitis") states the following:

## NATURE OF THE CONTROVERSY

1.      This Amended Complaint is brought on behalf of Overwell Harvest, individually, and derivatively on behalf of the stockholders of Neurensic, Inc. (n/k/a "NS Liquidation Corp.") ("Neurensic" or the "Company"), a Delaware corporation, which invested a total of $3.5 million dollars in the Company. Overwell Harvest seeks compensatory and punitive damages from Defendants for their breach of fiduciary duty to Overwell, the Company, and its other shareholders in connection with the management of the Company and, ultimately, the sale of its remaining assets to Trading Technologies International, Inc. ("Trading Technologies"). Defendants' breach of

fiduciary duty has resulted in the complete failure of the Company and the loss of the Company's most valuable assets, all of which has imperiled Overwell Harvest's substantial investment in the Company.

2.     Overwell Harvest originally filed this action seeking declaratory and injunctive relief, to enjoin Defendants from depriving the Company's stockholders of proper notice and process to which they are entitled under the Company's Bylaws and applicable Delaware law, and to enjoin Defendants from impermissibly stripping them of their right to evaluate the material terms of the proposed transaction on a fully informed basis and make a competitive bid for the Company's assets, just as Widerhorn had earlier implored the stockholders to do.

3.     On September 7, 2017, the Court enjoined Defendants from taking any action with respect to the sale of the Company's assets unless and until the Board had complied with all applicable notice requirements and stockholder voting procedures required under the Company's Bylaws and Delaware law. (Sept. 21, 2017 Ct. Order; Dkt. 19.) Based on the notices that were subsequently issued by Defendants, including the notice of a meeting at which the stockholders would vote on the sale of the Company's assets to Trading Technologies, the earliest date the transaction could have closed—i.e. the earliest date the Company's assets could have been transferred to Trading Technologies—was October 5, 2017.

4.     Nevertheless, and in complete disregard of the Court's prior orders, their fiduciary duty to the Company and its shareholders, and ████████████████████
███████████████████████████████████████████████████████
████████████████████████     ████████████████████████

███████████████████████████████████████████████████

Defendants permitted this to happen despite knowing that ███ █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ Furthermore, Defendants allowed ████████████████

███████████████████████████████████████████████████

██████████████████████ before a valid stockholder vote was taken to approve the sale of the Company's assets to Trading Technologies.

5.      The impact of these damaging actions was compounded after the Company was forced to provide the shareholders a waiting period to assess the sale and a competitive bid was submitted by Overwell Harvest. Indeed, after hearing Defendants' counsel represent to this Court that Trading Technologies would not pursue the sale if the temporary restraining order was granted and was forced to reduce its offer as a result of the injunction proceedings, Overwell Harvest made an initial offer of $400,000 for the assets of Neurensic—███████████████████████████████████

6.      Because Defendants had allowed ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████—Defendants could not unwind those actions to adequately or legitimately address Overwell Harvest's superior offer or potential counteroffers.

7.    In  response,  ███████████████████████████████,
Defendants allowed Trading Technologies to match Overwell Harvest's offer, without a
stockholder vote or Board action, but refused to allow Overwell Harvest the opportunity
to submit an even higher bid, which Overwell Harvest was ready, willing, and able to do.
By failing to permit a competitive bidding process and seek the highest value for the
Company's assets, Defendants denied the Company's stockholders a more valuable and
financially superior opportunity than that which was offered by Trading Technologies.
Indeed, by early September 2017, the sale of the Company's assets to Trading
Technologies was a *fait accompli*.

8.    Defendants' intentional and misleading misrepresentations, breaches of
fiduciary duty, and corporate waste have rendered Overwell Harvest and the other
stockholders' investment in the Company worthless. Plaintiff also seeks an order
compelling the complete disclosure of certain of the Company's books and records in
accordance with 8 Del. C. § 220.

## PARTIES

9.    Plaintiff Overwell Harvest Limited is a British Virgin Islands company,
whose registered agent is located at Road Town, Tortola, British Virgin Islands. Plaintiff
is a holding company for three other entities, all of which were formed outside the United
States, with principal places of business outside the United States, and whose
shareholders and/or members are non-US citizens.

10.    Defendant David Widerhorn is a citizen of the State of Illinois and resides
in Illinois. Widerhorn was, at all times relevant, the President, Chief Executive Officer,
and a member of the Board of Neurensic. On December 17, 2017, Widerhorn filed a

voluntary Chapter 7 petition in the United States Bankruptcy Court for the Northern District of Illinois. Consequently, the automatic stay prohibits Overwell from proceeding against Widerhorn in this action and on this Amended Complaint.

11.    Defendant Paul Giedraitis is a citizen of the State of Illinois and resides in Illinois. Giedraitis was, at all times relevant, the Chief Operating Officer of the Company and a member of the Board of Neurensic.

## JURISDICTION AND VENUE

12.    The Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

13.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS

### Neurensic and the Parties Who Controlled Neurensic

14.    Once heralded as a cutting-edge startup in the financial technology sector based on its ability to deploy machine learning technology and software to detect abnormal trading activities that pose regulatory risk to firms in the financial industry, Neurensic is now defunct. Its legal existence is maintained solely ██████████ ████████████████████████████████████████████████████████ ██████████████████████████████, the company to whom substantially all of Neurensic's assets were sold.

15.    The Company has been majority owned and controlled by its President and Chief Executive Officer, David Widerhorn, since it was formed in June 2015. Paul

Giedraitis, Widerhorn's accomplice, similarly exerted control of the Company at all times relevant by virtue of his position as Chief Operations Officer, as a member of the Company's Board of Directors, and through his alliance with and unflinching loyalty to Widerhorn.

### *Overwell Harvest's Investment in Neurensic*

16.     Overwell Harvest participated in at least two rounds of financings with Neurensic. The first financing by Overwell Harvest occurred on or around December 11, 2015. At that time, Overwell Harvest invested $2.5 million in Neurensic and was told that the valuation of the Company was $60 million and that its investment was the tail end of a $6-7 million raise in which Neurensic had secured other sizable and committed investors—a material representation critical to inducing Overwell Harvest to invest that Widerhorn knew to be false.

17.     Overwell Harvest's second cash infusion into the Company was made in three tranches. The first two tranche were made in July 2016; the third tranche was made in August 2016. However, Overwell's second equity investment was memorialized in writing in February 2017. Overwell's second investment was made in exchange for preferred shares in Neurensic, a pledge of a portion of Widerhorn's interest, a Board seat, and certain veto rights, among other things. Overwell Harvest was advised that its investment in the Company constituted approximately one-third of what was raised through the multiple offerings.

18.     Following Overwell's second equity investment in Neurensic, the Company established offices in New York and leased additional space in Chicago. Stockholders were advised that there would be a larger investment round and that multimillion

dollars' worth of business was imminent, which would necessitate the additional staff and office space—and would substantially improve the Company's exit valuation— another material representation that was critical to inducing Overwell Harvest to invest and which Widerhorn knew to be false.

### *Widerhorn's Early Morning Disclosure of Issues with the Company's Books and Records and Threat to Sell the Company's Assets*

19.    On August 16, 2017, six months after Overwell Harvest's second investment was finalized and contrary to what Wiederhorn had previously represented, Widerhorn informed the stockholders that the Company had been without a comptroller for six months and had not "been able to catch up on the books [and records] until recently."

20.    Widerhorn advised that the Company had identified "a number of issues with [its] accounting practices from the prior management of books [and records]," which required a "reconciliation" of thousands of financial transactions going back to the Company's initial formation. Widerhorn informed the stockholders that a decision was made to "thoroughly review and reconcile the books from the date of incorporation to ensure we have accurate and precise numbers for all assets and liabilities to date."

21.    Widerhorn explained to the stockholders that the reconciliation process "ha[d] been extremely burdensome" and required, among other things, "the reconciliation of thousands of transactions" and that the Company had "been working with our accounting firm and newly [retained] law firm" to achieve those ends. Widerhorn knew these statements were false when he made them.

22.    Widerhorn further advised the stockholders that the Company was now insolvent and its assets must be sold immediately. Widerhorn made reference to entities

that were purportedly interested in acquiring the Company but noted that those potential buyers "have withdrawn their interest and are unwilling to move forward given the state of the company's financial affairs."

23.     Widerhorn informed the stockholders that Trading Technologies was the only buyer that remained interested in acquiring the Company, and that Trading Technologies would likely make an offer in the range of $200,000 to $400,000. A term sheet was not disclosed or provided to Kenneth Chu ("Chu"), Overwell's representative on the Board, or the disinterested stockholders. Nor was Chu or the disinterested stockholders given all material information necessary for them to independently evaluate the fairness of the proposed transaction with Trading Technologies.

24.     Widerhorn concluded his missive by inviting the stockholders to "reach out with ideas, feedback, and support" in order to "decide the final fate of the [Company] by the end of this calendar month [i.e., August 2017]."

25.     Approximately 30 hours later, on August 18, 2017, Widerhorn followed up with an email at 4:00 a.m. and advised the stockholders that "[g]iven the financial situation, multiple creditor lawsuits, and government debt/tax collection efforts, we must accept an offer to sell the company in the coming days."

26.     Widerhorn advised that if an investor group did not emerge from among the Company's stockholders and transmit a letter of intent to acquire the Company for at least $1.5 million by the close of business on Monday, August 21, 2017, the Company's assets would be sold to Trading Technologies. Specifically, Widerhorn said that unless the disinterested stockholders were "willing to purchase the company for a fair price that satisfies emergency liens ($1.5 million or greater), we will have a fiduciary obligation to

move forward with [the Trading Technologies offer] and transfer full ownership of the business." Widerhorn added that "[i]f this business is at all of interest to the investor group to continue operation and capitalize on the market opportunity, now is the time to make an offer, as we will not be able to turn back soon."

27.     Widerhorn's demand that an investor group present a letter of intent in one business day and be willing to pay "$1.5 million or greater" for the Company while simultaneously advocating the sale of the Company's assets to Trading Technologies for $200,000 to $400,000 evidences Defendants' failure to properly explore potential alternatives to maximize sale proceeds and, correspondingly, stockholder value.

28.     Widerhorn concluded by warning the stockholders: "We will need a letter of intent [from an investor group of stockholders] by the close of business Monday [August 21] to stop the [Trading Technologies] process if this is of interest." If not, Widerhorn concluded, "the company will likely be forced to accept an offer from Trading Technologies "in the range of $200,000-400,000 next week."

29.     Neither Overwell nor any of the stockholders were advised as to what had occurred in the 30 hours between Widerhorn's August 16 and August 18 emails that warranted these extreme and unreasonable demands, particularly in light of Widerhorn's disclosures concerning the Company's financials just days earlier.

### Widerhorn Misleads Stockholders by Stating that the Company's Financials Have Been Reconciled and Audited

30.     Shortly thereafter, Widerhorn wrote the shareholders on August 23, 2017 and stated, "[r]egarding the financials, they are almost completed being reconciled and audited." According to Widerhorn, the restated and audited financials "reflect the same liabilities (with [minimal] changes) which have been accurately stated since inception,

9

but substantially stronger assets and higher EBITDA due to the capitalization of software development costs," noting that "[t]his is a plus for all of us and only increases our negotiating leverage."

31.     When questions were raised with regard to the Company's financials, however, Widerhorn admitted on August 29, 2017, that the Company had not been working with an accounting firm or a law firm on the financials, as he had led the stockholders to believe several days earlier, because "no firm was willing to accept the job" and because legal counsel had unexpectedly resigned and terminated its relationship with the Company on August 23, 2017.

32.     Rather, Widerhorn claimed that his training and experience at MIT, "15 years [of] experience using QuickBooks," and "prior business experience, including [his] parents' business growing up," rendered him competent to perform the audit and reconciliation of the Company's finances himself. Furthermore, he claimed to have a long-time friend and accountant "on speed dial for any complex questions and/or tax related matters."

33.     The Company's financials were not, and have not been, reviewed, restated, or audited by any financial or legal professional as Widerhorn falsely represented to the Company's stockholders. As Widerhorn ultimately admitted, "we did not have our financials fully audited by a third-party firm." Instead, Widerhorn attempted to make sense of his earlier statements by explaining, "[m]y earlier comment about auditing was meant to mean that with the assistance of advice from [his accountant friend], I personally audited the financials."

34.    Widerhorn is not an accountant or CPA and is thus not competent to audit the Company's financials, confront tax issues facing the Company, or restate the Company's financials, as he claims to have done. Consequently, the stockholders were unable to properly assess the transaction proposed by Trading Technologies or the impact of Widerhorn's "audit," and the stockholders today remain completely in the dark as to the residual value of their respective investments in the Company. Overwell Harvest's investigation in that regard is continuing and on-going.

35.    Defendants have grossly mismanaged the Company—both from a financial and strategic standpoint. Despite Overwell's $3.5 million investment and the investments of the other stockholders, between December 2015 and February 2017, the Company was purportedly insolvent by August 2017, and its debts included: (1) $180,000 to the United States Treasury for back taxes; (2) $80,000 to the Small Business Association for outstanding loans; (3) between $700,000 and 800,000 in back wages owed to Company employees; and (4) $2.5 million in general unsecured debt, all of which Defendants knowingly allowed to accrue. In addition, lawsuits were filed against the Company by Chicago BT Property, LLC; Tim Geannopulos; and Tayloe Draghon.

36.    The precarious financial position of the Company made any strategic transaction or capital raise virtually impossible. Confronted with this scenario, Defendants attempted to offload the Company's assets to Trading Technologies without a full and complete disclosure of the material terms pertaining to the transaction and without giving Overwell and the other stockholders the required notice provided by the Company's Bylaws and applicable Delaware law, which would permit them to explore

other alternative—including preparing a competitive offer for the Company's assets themselves.

*Overwell Harvest Obtains Injunctive Relief*

37. Against this backdrop and in light of Defendant Widerhorn's threats to sell substantially all of the Company's assets to Trading Technologies in complete disregard of Plaintiff's rights under the Company's Bylaws and applicable Delaware law, Overwell Harvest originally filed this action seeking declaratory and equitable relief.

38. In particular, Plaintiff sought a declaration that Defendants were obligated to provide adequate notice under the Company's Bylaws and applicable Delaware law and that Defendants were duty bound to disclose to Overwell Harvest and the other stockholders all of the material facts concerning the threatened sale of the Company's assets to Trading Technologies and an order enjoining the sale of the Company's assets unless and until such disclosures and notices were given.

39. On August 24, 2017, prior to presenting Overwell Harvest's motion for temporary restraining order, Defendants represented that a sale was not imminent and consented to a 14-day *status quo* order, pursuant to which they agreed: (1) no sale of the Company's assets would take place in the next 14 days and (2) in the event any offer is made, Defendants shall provide all notices and disclosures required under the Company's Bylaws and applicable law. (*See* Aug. 24, 2017 Ct. Order; Dkt. No. 12.) Nonetheless, Defendants continued to negotiate the terms of an agreement with Trading Technologies and maintain that they had provided adequate disclosures and notices.

40. Plaintiff's motion for temporary restraining order, (Dkt. 7), was ultimately heard on September 7, 2017, after which the Court concluded that Defendants had,

indeed, failed to comply with the Company's Bylaws and applicable Delaware law and had failed to disclose to Plaintiff and the Company's stockholders all material facts related to the proposed transaction.

*Trading Technologies Submits a Revised*
*Term Sheet and Exclusivity Agreement*

41.    On September 11, 2017, Trading Technologies submitted a revised, non-binding term sheet (the "Revised Term Sheet") to Neurensic. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

The Revised Term Sheet did not create any legally binding obligation between Neurensic and Trading Technologies.

42.    On September 11, 2017, Trading Technologies also submitted Revised Exclusivity Agreement (the "Revised Exclusivity Agreement") to Neurensic. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

13

*Widerhorn and Giedraitis Vote in Favor of Executing*
*The Revised Term Sheet and the Revised Exclusivity Agreement*

43.     Defendants issued notice of a special meeting of the Neurensic Board of Directors to be held on September 14, 2017 for the purpose of voting on the Revised Term Sheet and the Revised Exclusivity Agreement.

44.     On September 14, 2017, at the special meeting of the Neurensic's Board of Directors, a majority of the Board voted in favor of executing the Revised Term Sheet and the Revised Exclusivity Agreement. Thereafter, on September 15, 2017, Widerhorn informed the stockholders that a majority of the Board had voted in favor of executing the Revised Term Sheet and the Revised Exclusivity Agreement and scheduled a Special Meeting of the Stockholder of the Company on October 5, 2017 to allow the stockholders to express their views and formally vote on the transaction proposed by Trading Technologies.

45.     The following day, September 15, 2017, Widerhorn informed the stockholders that ███████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████

*Defendants Were Interested Directors Before and Remained Interested Directors*
*Under the terms of the Revised Term Sheet*

46.     Before Plaintiff filed this action, Defendants were slated to receive lucrative consulting contracts from Trading Technologies as part of the transaction. In particular, Defendants would have received, ███████████████████████████ ████████████████████████████████████████████████████

14

Consequently, Defendants had an interest in the transaction and were considered "interested directors" under applicable law.

47. Trading Technologies' Revised Term Sheet removed the consulting contracts and consulting fees that would be paid to Defendants. Defendants contended that the Revised Term Sheet cured their status as "interested" directors. However, Defendants—both officers and directors of the Company—knowingly failed to pay taxes and back wages in the amount of nearly $1 million. In fact, Widerhorn acknowledge in an August 29, 2017 email that the United States Government was owed approximately $180,000 and that back wages were owed in the amount of approximately $700-800,000.

48. Defendants knowing and intentional failure to pay taxes and back wages due subjected them to personal and potential criminal liability for those amounts. This exposure—personal liability for these obligations due to their mismanagement of the Company's affairs—inherently jeopardized their objectivity and differentiated them from the other stockholders in terms of what they stood to gain if the transaction with Trading Technologies closed. In other words, Defendants had every reason to recommend accepting the terms proposed by Trading Technologies in order to stave off collection efforts as well as to avoid the potential civil and criminal liability associated therewith. This potential liability, by definition, made Defendants' interest in the Trading Technologies' transaction different from the other stockholders.

██████████████████████████

49. In early September, before the Board convened on September 14, 2017 to vote on whether to execute the Revised Term Sheet and Revised Exclusivity Agreement or recommend the transaction to the stockholders for a vote, but apparently convinced

that the Court would deny Overwell Harvest's attempt to enjoin the sale, ███████████

██████████████████████████

     50.    In particular, on September 1, 2017, ███████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████

     51.   ██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████

     52.    Widerhorn was aware no later than September 12, 2017 that ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████    Furthermore, upon information and belief, in order to facilitate the

appearance to Neurensic's customers that ███████████████████████

███████████████████████████████████

███████████████████████████████████████████████████ At that point, the Court's temporary restraining order had been in place for five (5) days.

53.    Likewise, around the same time, Trading Technologies ████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ In fact, Trading Technologies informed Widerhorn that ████████████████████████████████████ ███████████████████████████████████████████

54.    Upon information and belief, ██████ ████████████ ████ █████ █████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████

55.    ████████████████████████████████████████████ ███████ are duty bound from disclosing the Company's confidential information and competing with the Company pursuant to and in accordance with the terms of their employment agreements.

56.    Though aware ██████████████████████████████████████ █████████████████████████████████████ Defendants took no action to enforce ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████

57.    In fact, not until after Kenneth Chu, the only disinterested member of the Board, raised the issue during the board meeting on September 14, 2017, ████████████ ████████████████████████████████████████████████████

17

58. ███████████████████████████████████

59.   Despite Defendants knowledge that ████████████████ ████████████████████████████████████████████ ████████ Defendants took no action to ████████████████ ███████████████████████████

### *Overwell Harvest Submits a Term Sheet that is Superior to the Term Sheet Submitted by Trading Technologies*

60.   Defendants were aware that Overwell Harvest was interested in making a competitive bid for substantially all of the Company's assets. As early as September 29, 2017, Overwell informed Defendants that a term sheet would be forthcoming.

61.   On October 4, 2017, Overwell transmitted to the Company a term sheet (the "Overwell Term Sheet") to acquire substantially all of its assets.

62.   Overwell Harvest's offer, detailed in the Overwell Term Sheet, offered to pay the Company $400,000 up front for the Company's assets, ████████████ ███████████████████████████████████████

63.   The Overwell Term Sheet did not include ███████████████ ████████████████████████████████████

18

████████████████████████████████████████████████████ Furthermore, while Defendants conceded that it was possible that the stockholders other than Overwell Harvest would to receive a ratable portion of those payments, it was nevertheless unlikely.

64.     Overwell's offer not only included a superior up-front cash component, Trading Technologies' Chief Financial Officer, Michael Kraines, had previously stated in an affidavit submitted to this Court on September 7 that unless the Company executed its proposed term sheet (which included ████████████████████), "TT's proposal will terminate and TT will not complete the transaction on the present terms." By all indications, the terms proposed by Overwell Harvest were superior to those proposed by Trading Technologies.

65.     Rather than further negotiate the terms of the Overwell Term Sheet with Overwell Harvest, ███████ ██████ ████████ ████ █████ █████████ ████████████████ Instead of terminating Trading Technologies' proposal, as Kraines earlier indicated Trading Technologies would do, ████████████████████████████ ██████████████████████████████████████████████████ Defendants refused, however, to allow Overwell Harvest to submit an even higher offer or alternative for the Company's assets, which Overwell Harvest was ready, willing, and able to do.

66.     By refusing to allow Overwell Harvest—an interested bidder for the assets of the Company—a fair opportunity to present a higher-value alternative to Trading Technologies's counter-offer, Defendants failed to achieve a transaction that was most valuable to the Company and its stockholders.

67. On October 5, 2017, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Upon information and belief, Defendants did not inform the stockholders of their failure to allow Overwell Harvest the opportunity to submit a higher bid or improve the terms of its offer or that Overwell Harvest was ready, willing, and able to do so.

68. On October 6, 2017, the Company completed the sale of all of its assets to Trading Technologies pursuant to and in accordance with that certain Asset Purchase Agreement dated as of October 6, 2017.

## FEDERAL RULE 23.1

69. Overwell Harvest brings the following claims against Defendants individually on its behalf and derivatively on behalf of the Company and for the benefit of its stockholders.

70. Overwell Harvest is a stockholder of the Company and was a stockholder of the Company at all times relevant, including the transactions complained of herein.

71. The filing of this Amended Complaint by Overwell Harvest is not a collusive one to confer jurisdiction that the court would otherwise lack.

72. Overwell Harvest has not made a demand on Defendants—who control the Company's Board of Directors—because Defendants have repeatedly denied any wrongdoing in connection with the sale of the Company's assets to Trading Technologies, including accusing Overwell Harvest and the other stockholders of "constructing a false narrative" and deploying a "litigation witch hunt" with regard to the allegations of

wrongdoing asserted against them. In addition, Defendant Widerhorn has filed for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code. *See* In re Widerhorn, 1:17-bk-37165 (N.D. Ill. 2017). Similarly, Defendant Giedraitis has publicly stated that he is "swimming in almost $200k in debt" and that he, too, is "on the verge of personal bankruptcy."

73.     Consequently, under these circumstances, including Defendants' view of the claims asserted against them and the current state of Defendants' financial affairs, it would be futile to demand that the Defendants, who control the Board, file suit on behalf of the Company against themselves, the directors responsible for the conduct alleged herein.

## BREACH OF FIDUCIARY DUTY

74.     Plaintiff repeats and incorporates by reference, as if fully set forth herein, Paragraphs 1 through 73 as set forth above.

75.     Plaintiff brings this claim directly and derivatively on behalf of the Company and its stockholders.

76.     At all times relevant, Defendants, as members of the Company's Board of Directors and Widerhorn, as a controlling stockholder, owed Plaintiff and the other stockholders fiduciary duties of loyalty and care.

77.     Defendants breached their fiduciary duty to Plaintiff and the other stockholders by, among other ways:

- abusing their positions of trust and confidence to further their own interests at the expense of the other stockholders;

- enabling a culture of mismanagement in which Widerhorn wielded unchecked authority to spend Company (i.e. stockholder) funds as he saw

21

fit, to the benefit of himself and to the detriment of the Company and its stockholders;

- falsely representing to the stockholders that the Company's finances and financial statements had been reconciled and audited by accounting firms and law firms when in fact Defendants themselves "reconciled" and "audited" the financials;

- failing to establish a minimum level of proper corporate record keeping, including failing to reconcile the Company's books and records for months on end;

- failing to pay federal taxes on behalf of the Company, thereby subjecting the Company, including its officers and directors, to potential civil and criminal liability;

- failing to pay employee wages in the range of $700,000 to $800,000, thereby subjecting the Company, including its officers and directors, to potential civil and criminal liability;

- knowingly allowing ████████████████████████████ ████████████ ██ ██████ ██ ██████ ████████ ██████ ██ ██ ████████ and failing to take any action, legal or otherwise, in response thereto;

- failing to apprise the stockholders that ██████████████████ ████████████████████████████████ ████████████████████;

- knowingly allowing ████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████;

- knowingly permitting ██████████████████████ ████████████████████████████████ ██████████████████████████;

- failing to adequately apprise the stockholders of the competitive, if not superior, offer submitted by Overwell Harvest to acquire substantially all of the Company's assets;

- failing and refusing to solicit a higher offer from Overwell Harvest for the Company's assets after allowing Trading Technologies to match the cash-component of Overwell Harvest's offer, particularly when Defendants knew

or should have known that Overwell Harvest was ready, willing, and able to pay more for the Company's assets than Trading Technologies; and

- failing to disclose material and reasonably available information to the stockholders concerning the sale of the Company's assets to Trading Technologies.

78. Overwell Harvest and the Company's stockholders have been damaged as a direct and proximate consequence of Defendants' conduct and breach of their fiduciary duties.

WHEREFORE, Plaintiff requests judgment in its favor, and in favor of the Company and its stockholders, and against Defendants David Widerhorn and Paul Giedraitis as follows:

(a) awarding compensatory and punitive damages in an amount deemed fair and equitable by the Court resulting from Defendants' deliberate, willful, and on-going conduct;

(b) awarding Plaintiff its cost of suit, including attorneys' fees relating to this action;

(c) ordering an accounting of the Company, including a good faith determination of the Company's fair market value; and

(d) awarding Plaintiff such other and further relief as the Court deems just and equitable.

## INSPECTION OF BOOKS AND RECORDS

79. Plaintiff repeats and incorporates by reference, as if fully set forth herein, Paragraphs 1 through 73 as set forth above.

80. Under 8 Del. C. § 220, Plaintiff, as a record stockholder of the Company, is entitled to inspect the Company's books and records.

81. On December 21, 2017, Plaintiff, through counsel, sought the inspection of certain of the Company's books and records for the purpose of investigating waste and

mismanagement at the Company and to ascertain whether Defendants breached their fiduciary duties to the stockholders in connection with the management of the Company and the handling of certain strategic transactions, including whether they acted properly in disposing of the Company's assets and filing to pursue and/or consummate other strategic transactions available to the Company.

82.     Plaintiff also seeks to ascertain the value of its stock in the Company.

83.     Defendants' response to Plaintiff's demand is incomplete.

84.     Under Section 220, if an officer of a corporation refuses to permit an inspection sought by a stockholder or attorney or agent acting on behalf of the stockholder, the stockholder may apply for an order to compel such inspection.

WHEREFORE, Plaintiff requests an order in its favor, and against Defendants David Widerhorn and Paul Giedraitis as follows:

(a)     Summarily ordering Defendants to allow Plaintiff to inspect the requested books and records and to make copies or extracts therefrom;

(b)     awarding Plaintiff such other and further relief as the Court deems just and equitable.

## RESERVATION OF RIGHTS

Plaintiff reserves unto itself all available claims as may prove through discovery to be applicable. Plaintiff reserves the right to assert such claims as investigation and discovery may prove applicable. Plaintiff further reserves the right to amend this complaint if investigation, discovery, and further information warrant such amendment, and further, to assert any applicable matters of law during the pendency of this action.

## JURY DEMAND

Pursuant to and in accordance with Federal Rule of Civil Procedure 38(b), Plaintiff

demands a trial by jury on all issues and claims so triable.

Dated: March 7, 2018
By: /s/ John J. Scharkey

John J. Scharkey
Robert D. Sweeney
SWEENEY & SCHARKEY LLC
111 West Washington Street
Burnham Center, Suite 1160
Chicago, Illinois 60602
(312) 384-0500

*Counsel for Plaintiff*
*Overwell Harvest Limited*

## **VERIFICATION**

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: March 7, 2018

Overwell Harvest Limited

By: _____

Kenneth Chu, One of its Directors

## CERTIFICATE OF SERVICE

I, John J. Scharkey, certify that I served a copy of Plaintiff's Amended Complaint on the following:

> Paul Giedraitis
> 939 West Winona Street
> Apartment No. 1E
> Chicago, Illinois 60640

using the Court's ECF/CM system, which will transmit notice to all parties of record, and by regular mail, postage pre-paid, from Chicago, Illinois on March 13, 2018.

s/ John J. Scharkey

27