# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| OVERWELL HARVEST LIMITED, a British Virgin Islands company, individually and derivatively on behalf of Neurensic, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | No. 17 C 6086 |
| v. | ) ) | Judge Sara L. Ellis |
| DAVID WIDERHORN, PAUL GIEDRAITIS, and TRADING TECHNOLOGIES INTERNATIONAL, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Concerned over the sale of Neurensic, Inc. ("Neurensic") to Defendant Trading Technologies International, Inc. ("Trading Technologies"), Plaintiff Overwell Harvest Limited ("Overwell") brought this suit individually and derivatively in its capacity as a Neurensic shareholder against Neurensic's Chief Executive Officer David Widerhorn and Chief Operating Officer Paul Giedraitis. Initially, Overwell sought declaratory and injunctive relief to slow the sale and ensure that board members received proper notice of it. Trading Technologies has acquired Neurensic and Overwell has added Trading Technologies to its suit. Overwell brings claims for breach of fiduciary duty against Widerhorn and Giedraitis, aiding and abetting breach of fiduciary duty against Trading Technologies, and failure to allow inspection of Neurensic's books and records against Widerhorn and Giedraitis. Giedraitis and Trading Technologies move to dismiss the respective claims against them. Because Overwell has sufficiently alleged a claim for breach of fiduciary duty, the Court denies Giedraitis' motion to dismiss. However, because

Overwell has not plausibly alleged the damages element of aiding and abetting breach of fiduciary duty, the Court grants Trading Technologies' motion to dismiss.

## BACKGROUND[1]

Neurensic is a Delaware company. "Once heralded as a cutting-edge startup in the financial technology sector," the company is now defunct. Doc. 60 ¶ 16. Until its sale to Trading Technologies in October 2017, Widerhorn was Neurensic's majority owner—he also was a member of the Board of Directors and served as the company's CEO and President. Giedraitis served as the Chief Operating Officer of Neurensic and was also a member of the Board.

Overwell participated in two rounds of financing with Neurensic. In December 2015, Overwell invested $2.5 million, on the understanding that the valuation of Neurensic was $60 million and that its investment concluded a $6–7 million financing in which Neurensic obtained other committed investors. Widerhorn knew these representations were false. Overwell's second investment occurred in July and August 2016, although it was not memorialized in writing until February 2017. Overwell made this second investment in exchange for "preferred shares in Neurensic, a pledge of a portion of Widerhorn's interest, a board seat, and certain veto rights." *Id.* ¶ 19. Following this second investment, Neurensic advised its shareholders that it would undertake a larger investment round and "that multimillion dollars' worth of business was imminent, which would . . . substantially improve the Company's exit valuation." *Id.* ¶ 20. Widerhorn also knew this representation was false. Overall, Overwell invested $3.5 million in Neurensic.

---

[1] The facts in the background section are taken from Overwell's amended complaint [61] and are presumed true for the purpose of resolving Giedraitis and Trading Technologies' motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

On August 16, 2017, Widerhorn notified shareholders that Neurensic had identified problems with its accounting practices and that the company was in the process of reviewing all of its transactions. He represented that Neurensic was working with an accounting firm and a law firm to complete its review. Widerhorn knew that these statements were false when he made them. He also informed shareholders that Neurensic was insolvent and needed to sell its assets as soon as possible. Further, he explained, although multiple entities had been interested in purchasing Neurensic, all but one had withdrawn their interest in light of the company's finances. Trading Technologies was the only remaining interested buyer, and it would likely offer to purchase Neurensic for between $200,000 and $400,000. Widerhorn did not disclose a term sheet to shareholders or Overwell's representative on the board.

Widerhorn followed up on August 18, 2017, with an email informing stockholders that "[g]iven the financial situation, multiple creditor lawsuits, and government debt/tax collection efforts, we must accept an offer to sell the company in the coming days." *Id.* ¶ 27. He stated that, unless an investor group submitted a letter of intent to acquire the Company for at least $1.5 million by the close of business on August 21, 2017, Neurensic would sell its assets to Trading Technologies.

In his next email to shareholders, on August 23, 2017, Widerhorn updated them regarding the financial accounting of Neurensic, stating that the reconciliation and audit of the company's financials was almost complete and would reflect similar liabilities to those Neurensic originally believed it had, but with "substantially stronger assets and higher EBITDA due to the capitalization of software development costs." *Id.* ¶ 32. However, on August 29, 2017, Widerhorn admitted that Neurensic did not work with an accounting firm or a law firm in its reconciliation and audit of Neurensic's finances because no firm would accept the job and

3

Neurensic's counsel ended its relationship with the company on August 23, 2017. Instead, Widerhorn himself performed the reconciliation and audit, sending any questions he had to friend who was an accountant. Widerhorn is neither an accountant nor a CPA. By August 2017, Neurensic owed approximately $3.5 million in debt, including debts to the government for back taxes and loans, Neurensic employees for back wages, and general creditors for unsecured debt.

In light of Widerhorn's emails regarding selling Neurensic, Overwell filed the present suit, initially seeking declaratory and injunctive relief. Overwell asked the Court to declare that Widerhorn and Giedraitis must provide notice pursuant to Neurensic's bylaws and Delaware law and to disclose material facts concerning the sale of Neurensic to Trading Technologies. Overwell further asked the Court to enjoin the sale unless Widerhorn and Giedraitis provided the described notice and material facts. At a September 7, 2017 hearing, the Court granted in part Overwell's motion for a temporary restraining order, finding that Neurensic had not complied with the notice requirements for a sale in its bylaws and according to Delaware law, and requiring Neurensic to re-notice the sale and provide adequate time before the shareholders voted on the proposed transaction.

Trading Technologies submitted a revised term sheet and a revised exclusivity agreement for the proposed transaction on September 11, 2017. A majority of Neurensic's Board of Directors voted in favor of executing these documents at a special meeting on September 14, 2017. Widerhorn provided the shareholders with notice of the agreements and the Board's vote on September 15, 2017, scheduling a vote for the shareholders on October 5, 2017.

Overwell was also interested in buying Neurensic, and it submitted a term sheet for its proposed purchase on October 4, 2017. The term sheet offered a higher upfront payment than Trading Technologies' term sheet, but it did not provide for true-up or earnout payments, which

Trading Technologies' term sheet contained. Widerhorn and Giedraitis provided Overwell's term sheet to Trading Technologies, which then increased its upfront cash offer to match Overwell's offer. Widerhorn and Giedraitis did not allow Overwell to increase its offer. Widerhorn informed shareholders on October 5, 2017 that Trading Technologies' term sheet was better than Overwell's but did not mention that he and Giedratis did not allow Overwell to update its term sheet. On October 6, 2017, Neurensic sold its assets to Trading Technologies.

Prior to the completion of the sale, Trading Technologies began hiring former Neurensic employees. On September 1, 2017, Trading Technologies hired Jay Biondo as its Product Manager-Surveillance. While at Trading Technologies, Biondo continued servicing Neurensic clients. Biondo asked his supervisors at Trading Technologies if he should continue working with Neurensic clients and moving projects forward even though he had resigned from Neurensic. Widerhorn was aware, at least by September 12, that Trading Technologies hired Biondo and had him working with Neurensic clients.

In addition, Trading Technologies hired Morgan Trinkhaus from Neurensic on September 19, 2017. It also hired former Neurensic employees Eric Eckstrand and Evan Story as software engineers. All of these former employees signed employment contracts with Neurensic that included non-competes and required them not to disclose Neurensic's confidential information. Overwell's representative on the Board raised concerns on September 14, 2017 about Trading Technologies hiring these former employees before its purchase of Neurensic, and Giedratis then raised the issue in a conference call with Trading Technologies.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Breach of Fiduciary Duty (Count I)

Giedraitis moves to dismiss Overwell's breach of fiduciary duty claim on the grounds that Overwell does not sufficiently allege that Giedraitis breached his duty or that the alleged breach caused any damage to Overwell.

As an initial matter, the Court notes the confusion in the briefing over which state's law to apply. Giedraitis argues in his reply that Illinois law applies. This is incorrect. "A federal court exercising diversity jurisdiction applies the choice-of-law rules in the forum in which it sits—here, Illinois law." *Act II Jewelry, LLC v. Wooten*, 301 F. Supp. 3d 905, 913 (N.D. Ill. 2018). The internal affairs doctrine governs here, which is "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S. Ct. 2629, 73 L. Ed.

6

2d 269 (1982). "Illinois choice of law principles . . . makes the law applicable to a suit against a director for breach of fiduciary duty that of the state of incorporation." *Id.* As Delaware is the state of Neurensic's incorporation, its laws govern this breach of fiduciary duty claim.

Under Delaware law, "[a] claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). "A breach of fiduciary duty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Id.* at 602. Giedraitis does not dispute that he owed Neurensic a fiduciary duty. Rather, he argues that Overwell has not successfully alleged a breach of his fiduciary duty and it cannot allege that it was damaged by any of the breaches detailed in the complaint. Overwell's breach of fiduciary duty claim against Giedraitis generally centers on his roles in the sale of Neurensic to Trading Technologies and Trading Technologies hiring former Neurensic employees before the sale occurred.

First, with respect to Trading Technologies hiring former Neurensic employees, Overwell alleges that Giedraitis breached his fiduciary duty to the company when he failed to take any action to enforce Neurensic's contracts with its former employees and even encouraged those employees to work for Trading Technologies. In his motion, Giedraitis argues that (1) Neurensic did not have enforceable restrictive covenants with its former employees that he could have taken action to enforce, (2) Overwell does not allege that the former employees actually violated their restrictive covenants with Neurensic or that Trading Technologies was a competitor,

7

(3) Neurensic could not have funded lawsuits against its former employees, and (4) Giedraitis did not have the authority to bring a lawsuit on Neurensic's behalf against the former employees.

Giedraitis' arguments on this issue delve into details that are not before the Court at this stage in the litigation. He contends that, to the extent former employees breached restrictive covenants through their employment at Trading Technologies, Neurensic had already breached those contracts by failing to pay them for their work and were thus unenforceable. But the only facts the Court knows at this juncture (taken from the amended complaint, as is appropriate at this stage in the litigation) are that the former employees had restrictive covenants with Neurensic and Neurensic owed at least some of its employees back wages. This is not enough to jump to the conclusion that Neurensic violated its employment agreements with the four specific former employees mentioned in Neurensic's complaint.

In addition, Giedraitis' arguments that Overwell does not actually allege that the former employees violated their restrictive covenants through their employment with Trading Technologies and that Trading Technologies was not a competitor fail upon review of the amended complaint. The amended complaint alleges that the former employees "are duty bound from disclosing the Company's confidential information and competing with the Company." Doc. 61 ¶ 57. In spite of the requirements of their employment agreements, the four former employees began working for Trading Technologies with the goal of "recreat[ing] [Neurensic's] business" for Trading Technologies. *Id.* ¶ 56. In fact, one former employee continued servicing Neurensic clients while working for Trading Technologies. *Id.* ¶ 53. To facilitate this employee's work, Trading Technologies' chief financial officer noted that he would need to install Neurensic software at Trading Technologies so that he could continue working with a Neurensic client. *Id.* ¶ 54. This is sufficient to allege that the former employees provided

8

confidential information to Trading Technologies in violation of their employment agreements. And performing Neurensic work for a different company but for the same clients that Neurensic serviced clearly constitutes competition with Neurensic, even if Trading Technologies was not formerly a competitor with Neurensic. Overwell has sufficiently put Giedraitis on notice of the claims against him regarding Neurensic's former employees.

Moreover, Overwell did not need to allege that Neurensic could have funded lawsuits against its former employees or that Giedraitis had the authority to bring such lawsuits. Giedraitis' arguments here are red herrings; Overwell does not complain that Giedraitis should have brought suit on Neurensic's behalf against its former employees. Rather, it alleges that he breached his duty to the company when he encouraged its former employees to continue their work for Neurensic clients with another company, essentially forcing the Trading Technologies sale before Neurensic shareholders had the opportunity to evaluate it and vote, as was required by both Neurensic's bylaws and Delaware law. In his reply, Giedraitis attempts to narrow Overwell's argument, noting that Overwell does not cite an authority "for its implicit assertion that an officer breaches his or her fiduciary duty if they don't at least threaten to pursue litigation against a former employee." Doc. 91 at 8. This characterization narrows Overwell's claim, and it also confuses the burdens in this motion. Giedraitis must establish that Overwell's allegations fail to state a claim upon which relief can be granted, and he cites no authority to support his contention that it has not. Ironically, Giedraitis has failed to do what he accuses Overwell of doing, and the Court will not consider unsupported arguments. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (holding that a party waives an argument if it is "underdeveloped, conclusory, or unsupported by law"); *TinleySparks, Inc. v. Vill. Of Tinley Park*, 181 F. Supp. 3d 548, 561 (N.D. Ill. 2015) (same).

Looking to Giedraitis' arguments regarding damages, he argues that Overwell cannot allege that the sale to Trading Technologies damaged it as a shareholder. However, while Illinois law requires plaintiffs to prove their damages in order to successfully establish a claim for breach of contract, Delaware law contains no such requirement. *Compare Kagan v. Waldheim Cemetary Co.*, 53 N.E.3d 259, 266, 2016 IL App (1st) 131274, 403 Ill. Dec. 205 (2016), *with Beard Research*, 8 A.3d at 601. Giedraitis argues that, even under Delaware law, plaintiffs must establish damages to recover for breach of fiduciary duty, but the cases that he cites stand for the opposite. In *Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC*, the court did note that "a plaintiff will not be awarded a meaningful remedy without additional showings that parallel the other elements of a traditional common law tort claim." No. 11802-VCL, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018). But the *Basho* court goes on to state that "[a] court may award nominal damages if a breach existed but does not warrant a meaningful remedy." *Id.*; *see also Ravenswood Inv. Co. v. Estate of Winmill*, No. 3730-VCS, 2018 WL 1410860, at *25 (Del. Ch. Mar. 21, 2018) (finding nominal damages appropriate where plaintiff failed to prove damages). In light of this, Giedraitis' damages argument is unpersuasive.

Finally, Giedraitis argues that all of his decisions are shielded by the business judgment rule.[2] "In Delaware, the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3rd Cir. 2005) (citing *Aronson v. Lewis*, 473 A.3d 805, 812 (Del. 1984)). "Generally speaking, [courts] will not rely an affirmative defense such as the

---

[2] In his reply brief, Giedraitis also raises an unclean hands argument. Because he did not raise this argument in his original motion, the Court will not address it. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

10

business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)." *Id.*; *see also Shamrock Holdings, Inc. v. Arenson*, 456 F. Supp. 2d 599, 609 (D. Del. 2006) ("The court . . . holds that defendants are not required to plead around the business judgment rule at this stage in the proceedings."). If, however, an unanswered affirmative defense appears on the face of the complaint, the Court may dismiss the complaint. *Id.* (proceeding to evaluate a complaint under the business judgment rule on a motion to dismiss because it "declare[d] that the business judgment rule d[id] not vitiate any of [the plaintiff's] claims").

In his motion, Giedraitis does not even argue that the business judgment rule appears on the face of the complaint. And review of the amended complaint does not reveal reference to the business judgment rule. Thus, like other federal courts applying Delaware law to a breach of fiduciary duty claim, this Court declines to require Overwell to plead around the business judgment rule in its complaint. *See Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 556–57 (D. Del. 2008) (declining to require that plaintiffs overcome the business judgment rule in their complaint). Giedraitis does not support his attempt to apply the standard at this stage in litigation—he only cites two cases where the court discussed the Delaware business judgment rule on a motion to dismiss, and neither is applicable. In the first, the court simply discusses the business judgment rule in the context of whether the plaintiff's derivative suit met the requirements of Rule 23.1. *Bresalier v. Good*, 246 F.Supp. 3d 1044, 1054 (D. Del. 2017). The second case, *McMullin v. Beran*, 765 A.2d 910 (Del. 2000), is inapplicable because the Delaware Supreme Court is applying Delaware's state pleading standards, which impose more onerous requirements than the federal pleading standard. *See Ad Hoc Comm.*, 554 F. Supp. 2d at 557–58 (distinguishing a case because "[t]here is no mention of Fed. R. Civ. P. 8 in that case and the court apparently looked to Delaware state court opinions to

11

determine whether the claims were properly plead [sic]; the application of which the *Tower Air* court subsequently held was inappropriate"). The Court will not impose review under the business judgment rule at this stage in the litigation.

## II. Aiding and Abetting Breach of Fiduciary Duty (Count II)

Trading Technologies moves to dismiss Overwell's claim that it aided and abetted a breach of fiduciary duty because (1) Overwell has not alleged that Trading Technologies provided knowing assistance, (2) Overwell has not alleged that the assistance Trading Technologies provided was substantial, and (3) Overwell has not sufficiently pleaded that Trading Technologies' conduct caused it damages. Because Overwell fails to specify what damages the breach of fiduciary duty caused it, the Court grants Trading Technologies' motion.

The parties do not clarify which state law applies to this claim. Neither party addresses the issue. Because the elements of the claim are the same under both Delaware and Illinois law and the Court would come to the same result applying either law, the Court need not decide which state's law applies.

To state a claim for aiding and abetting a breach of fiduciary duty in Illinois, a plaintiff must allege the elements for a breach of fiduciary duty, as well as "facts to show that the defendant kn[ew] that the other's conduct constitute[d] a breach of duty and [gave] substantial assistance or encouragement to the other." *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 809 (N.D. Ill. 2013) (internal quotation marks omitted). Similarly, under Delaware law, the four elements of an aiding and abetting claim are: (1) a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) "knowing participation in that breach by the defendants," and (4) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

A. **Knowing and Substantial Assistance**[3]

Trading Technologies argues that Overwell has not pleaded that Trading Technologies had actual knowledge of the duty breached, as is necessary to state a claim. Review of the amended complaint, however, shows the opposite: Overwell alleges repeatedly that Trading Technologies aided Widerhorn and Giedraitis' breach by hiring key employees from Neurensic and facilitating Trading Technologies taking possession of some of the company's assets, including "propriety and confidential software and the servers that housed the software" prior to the completion of the sale. Doc. 60 ¶¶ 85–86. Trading Technologies participated in the transfer of assets despite its knowledge that such action would violate Widerhorn and Giedraitis' fiduciary duties as well as this Court's temporary restraining order on the sale of the company. Moreover, the amended complaint states that Trading Technologies committed these actions "knowing that its conduct furthered Widerhorn and Giedraitis' breach of their fiduciary duties." *Id.*

Trading Technologies argues that these statements are conclusory and that the amended complaint lacks any specific allegation that Trading Technologies was aware of restrictive covenants between its new employees and Neurensic. Again, review of the amended complaint proves this argument unsuccessful. First, the complaint explicitly states that "Trading Technologies hired these employees fully aware of their confidentiality and other obligations to [Neurensic]." *Id.* ¶ 58. In addition, the amended complaint alleges that Trading Technologies was aware that its new employees' former relationship with Neurensic could cause problems: Biondo specifically raised the issue to his supervisors at Trading Technologies, and the issue became a topic of discussion between Trading Technologies, Giedraitis, and Widerhorn. Once

---

[3] Trading Technologies also makes similar arguments to Giedraitis' arguments that Overwell does not sufficiently plead that Neurensic had enforceable restrictive covenants with its former employees—the Court refers Trading Technologies to its analysis above.

Trading Technologies raised the issue with Giedraitis, Giedraitis further alerted Trading Technologies that the employment relationships could be a problem with the other board members. Doc. 61 ¶ 60. Finally, Overwell's claim here is not limited to Trading Technologies' action in hiring former employees; the amended complaint also alleges that Trading Technologies knowingly participating in the transfer of Neurensic's confidential software. *Id.* ¶ 54 (alleging that Trading Technologies' Chief Financial Officer wrote to Widerhorn and informed him that "we have Jay B joining us, but he'll need to install Neurensic software here" so that Biondo could start servicing Neurensic clients). At this stage in the litigation, Overwell has met its pleading burden under Rule 8 regarding the knowledge element.

Trading Technologies also argues that, even if Overwell has alleged knowledge of its assistance, Overwell has not alleged that Trading Technologies' conduct substantially assisted a breach of fiduciary duty. Trading Technologies relies heavily on *Premier Capital Management*, LLC v. Cohen, No. 02 C 5368, 2008 WL 4378313 (N.D. Ill. Mar. 24, 2008), to support this argument. In *Premier Capital*, the court found that the defendants were "simply doing their jobs and performing tasks they typically performed in the course of business" and so the conduct at issue was not "active and direct" enough to be substantial. 2008 WL 4378313, at *6. But that is where *Premier Capital* and this case diverge: unlike the defendants in that case, Overwell's allegations against Trading Technologies detail active participation and facilitation of Widerhorn and Giedraitis' breach of fiduciary duty. Looking to the same sections of the amended complaint cited above, those allegations demonstrate more than passive and indirect conduct—Overwell alleges that Trading Technologies' general counsel expressed concern that Neurensic's other board members would find out that Trading Technologies had access to Neurensic's IP (which Overwell alleges that Trading Technologies had). Doc. 61 ¶ 60. This implies an awareness and

14

participation in the scheme. Again, at this stage in the litigation, the Court finds that Overwell has alleged sufficient facts to state a plausible claim that Trading Technologies' contribution to the breach was substantial.

### B. Damages

Trading Technologies also contends that Overwell has not sufficiently pleaded that it was damaged as a result of the conduct. Here, Overwell pleads itself out of court. Overwell states that Neurensic had approximately $3.5 million worth of debt, Doc. 61 ¶ 37, and the only two offers (including one from Overwell itself) contained cash components of $400,000, *id.* ¶¶ 64, 67. Trading Technologies argues that Overwell's own complaint establishes that it did not suffer any damages, as Neurensic could not have received an offer that exceeded its liabilities and so the shareholders would not have recovered value. Overwell does not directly respond to this argument, merely stating that the breach "deprived [Overwell] of the opportunity to competitively bid for Neurensic's assets, which would have resulted in a higher offer and thus greater value for Neurensic and its stockholders." Doc. 81 at 10. But Overwell would have had to increase its offer by more than eight times in order to derive any value for the shareholders. A complaint must be facially plausible to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678. The Court does not find Overwell's claim for damages plausible here; the numbers simply do not align. And Overwell's argument that there is no heightened pleading standard for damages misses the point; in order to succeed on its claim for aiding and abetting breach of fiduciary duty, it must allege some damages. It has not plausibly done so here, and so the Court grants Trading Technologies' motion to dismiss. Trading Technologies asks that the Court grant its motion with prejudice; because it is possible that Overwell could successfully amend its complaint, the Court declines to dismiss the claim with prejudice.

## III. Inspection of Books and Records (Count III)

The Court has granted Overwell leave to amend Count III with regard to Giedraitis and dismissed Count III as to Giedraitis without prejudice. *See* Doc. 92. In light of this, the Court denies Giedraitis' motion to dismiss Count III as moot.

## CONCLUSION

For the foregoing reasons, the Court denies Giedraitis' motion to dismiss [77] and grants Trading Technologies' motion to dismiss [69].

Dated: January 31, 2019

SARA L. ELLIS
United States District Judge