**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OVERWELL HARVEST LIMITED, a British Virgin Islands company, individually and derivatively on behalf of Neurensic, Inc. | ) ) ) ) | |
| Plaintiff, | ) ) | No. 17 C 6086 |
| v. | ) ) | Judge Sara L. Ellis |
| DAVID WIDERHORN, PAUL GIEDRAITIS and TRADING TECHNOLOGIES INTERNATIONAL, INC. | ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

After Trading Technologies International, Inc. ("Trading Technologies") bought Neurensic, Inc. ("Neurensic"), Overwell Harvest Limited ("Overwell") brought this suit individually and derivatively in its capacity as a Neurensic shareholder against Neurensic's Chief Executive Officer David Widerhorn, its Chief Operating Officer Paul Giedraitis, and Trading Technologies. After several rounds of litigation before this Court, Overwell filed a second amended complaint[1] alleging breach of fiduciary duty against Giedraitis and Widerhorn (Count I), and aiding and abetting breach of fiduciary duty against Trading Technologies (Count II). Giedraitis and Trading Technologies move to dismiss the respective claims against them.[2] Giedraitis argues that this Court does not have subject matter jurisdiction to hear Overwell's suit against him because there is not complete diversity between the parties, and because Overwell has failed to prove the requisite amount in controversy. Trading Technologies argues that

---

[1] This is in fact Overwell's third amended complaint but consistent with the complaint's caption and label, the Court refers to this as Overwell's second amended complaint.
[2] Widerhorn filed for bankruptcy on December 15, 2017, automatically staying the proceedings against him.

Overwell has failed to state a plausible claim for damages, and therefore the suit against Trading Technologies must fail. The Court finds that these arguments are without merit and denies the Defendants' motions to dismiss.

## BACKGROUND[3]

Neurensic is a Delaware corporate startup in the financial technology sector that is now defunct. Widerhorn was the company's CEO and president. Giedraitis was the Chief Operating Officer.

Overwell, a British Virgin Islands company, was one of the principal investors in Neurensic. It invested $3.5 million from 2015 to 2017 and received a seat on the Board of Directors. Overwell made these investments based on Neurensic's false representations that it had a value of $60 million, that it had raised several millions more from other committed investors, and that the investments would "substantially improve the Company's exit valuation." Doc. 99 ¶ 20.

By mid-August 2017, Neurensic was insolvent. According to Widerhorn, the company owed approximately $3.5 million in debt, including back wages to employees, back taxes and loans to the government, as well as debts to general creditors. In an email to shareholders on August 16, Widerhorn represented that the company was working with an accounting firm and a law firm to complete an audit. This was false. Instead Widerhorn himself, who is not an accountant, performed the audit. Even now, a third-party professional has yet to audit the

---

[3] The facts here are largely taken from Overwell's second amended complaint and are presumed true for the purpose of resolving Trading Technologies' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). Additional facts are taken from materials submitted by Giedraitis in order to determine the motion to dismiss for lack of subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). Additionally, the Court presumes familiarity with its January 31, 2019, Opinion and Order, Doc. 93. The facts here are largely similar, and this Opinion only sets forth those facts necessary to resolution of the pending motions to dismiss and refers readers to the background section in its January 31, 2019, Opinion and Order, for a more detailed description of the underlying facts.

company's financials. Widerhorn also told shareholders that the company's "assets must be sold immediately." *Id.* ¶ 24. Although several entities were interested in buying the company, he claimed they had "withdrawn their interest and [we]re unwilling to move forward given the state of the company's financial affairs." *Id.* The only interested buyer remaining was Trading Technologies, who would likely offer between $200,000 and $400,000.

On August 18, 2017, Widerhorn told shareholders that unless another investor came forward by August 21 and agreed to buy the company for at least $1.5 million—the amount of the company's emergency liens—Neurensic planned to sell its assets to Trading Technologies. On August 25, Widerhorn stated that he and Giedraitis had met with Trading Technologies and argued that "even with the amortization cost, the book value of [Neurensic's] technology assets [wa]s approximately $2.5 [million] and that [the company's] investors would like to see a fair return in line with the value of the assets[.]" Doc. 106-1 at 28.

Overwell filed a complaint for injunctive relief on August 22, 2017, asking this Court to stay the impending sale to Trading Technologies because Neurensic failed to comply with notice and disclosure requirements. On September 7, the Court granted Overwell's motion in part and later issued an Order directing Neurensic to halt the sale until "the Board satisfies all applicable requirements of Delaware law and the Bylaws of Neurensic, Inc." Doc. 19.

Around that time, Trading Technologies began hiring former Neurensic employees to help ensure a smooth transition of Neurensic's business. On September 1, 2017, Trading Technologies hired Jay Biondo, who continued servicing Neurensic clients while working for his new employer. On September 19, Trading Technologies hired Morgan Trinkhaus "to ensure [Trading Technologies' acquisition of Neurensic] ha[d] the greatest chance of reaching its long-term potential." Doc. 99 ¶ 56. Trading Technologies also hired former Neurensic employees

3

Eric Eckstrand and Evan Story as software engineers to help "recreate the business" for Trading Technologies. *Id.* ¶ 57. All of these employees had signed employment contracts with Neurensic that prohibited them from competing with Neurensic or from disclosing the company's proprietary information. Widerhorn knew that Biondo was working for Trading Technologies no later than September 12. Overwell's representative on the Board, Kenneth Chu, raised concerns about Trading Technologies hiring former employees at a board meeting on September 14. Giedraitis raised the issue in a subsequent conference call with Trading Technologies; beyond that, neither Giedraitis nor Widerhorn took any action to enforce the non-compete and non-disclosure agreements.

On September 11, 2017, Trading Technologies submitted a revised term sheet to purchase the company for $300,000. Among other terms, the offer included earnout provisions that would allow the company to receive a return on future earnings from its assets. On September 14, a majority of Neurensic's Board of Directors voted in favor of accepting the offer. The next day Widerhorn provided shareholders with notice of the agreement and scheduled a final vote on October 5.

On October 4, Overwell submitted its own term sheet to purchase Neurensic for $400,000. It did not include other terms that Trading Technologies had offered, such as an earnout provision. Widerhorn and Giedraitis provided Overwell's term sheet to Trading Technologies, which increased its upfront cash offer to match Overwell's offer. Widerhorn and Giedraitis did not allow Overwell to increase its offer. Widerhorn informed shareholders on October 5 that Trading Technologies' term sheet was better than Overwell's term sheet. Neither he nor Giedraitis mentioned that they did not allow Overwell to submit a second offer. On October 6, 2017, Neurensic sold its assets to Trading Technologies.

4

# LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The party asserting jurisdiction has the burden of proof. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). The standard of review for a Rule 12(b)(1) motion to dismiss depends on the purpose of the motion. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction (a facial challenge), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See id.*; *United Phosphorus*, 322 F.3d at 946. If, however, the defendant denies or controverts the truth of the jurisdictional allegations (a factual challenge), the Court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction by a preponderance of the evidence. *See Apex Digital*, 572 F.3d at 443–44; *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.

Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**ANALYSIS**

This is the second time that Giedraitis and Trading Technologies move to dismiss the respective claims against them. The Court previously denied Giedraitis' motion to dismiss on the basis that Overwell had sufficiently alleged the existence of a fiduciary duty, and that Giedraitis breached that duty. The Court found that Overwell need not allege anything else to sufficiently state a claim at this stage of the proceeding. The Court simultaneously granted Trading Technologies' motion to dismiss on the basis that Overwell had not sufficiently alleged damages. The Court reasoned that "Overwell would have had to increase its offer by more than eight times in order to" exceed the company's liabilities and "derive any value for the shareholders." Doc. 93 at 15.

If it seems odd that a plaintiff need not allege damages to plead breach of fiduciary duty, but must do so to sustain a claim for aiding and abetting breach of fiduciary duty, it is because this would be a rare situation. If a plaintiff seeks compensatory damages, as Overwell does in this case, they must allege damages to sustain a breach of fiduciary duty claim. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 920 (Del. Ch. 1999) ("If the plaintiff requests more than nominal damages, the complaint must allege facts sufficient to support the damages requested."). [4] And if a plaintiff seeks nominal damages in a direct shareholder suit, it must

---

[4] Per the Court's reasoning in its previous Opinion, Doc. 93 at 6–7, the Court applies Delaware law to assess Overwell's claims against Giedraitis under the "internal affairs doctrine." *CDX Liquidating Tr. v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011). The Court previously stated that it need not decide which state's law governs Overwell's claims against Trading Technologies since the elements of aiding and abetting breach of a fiduciary duty are the same under Illinois and Delaware law. But because "the aiding and abetting claim cannot exist without the underlying allegation of breach of fiduciary duty," the

6

allege that the wrongful conduct deprived it of its economic or voting rights. *In re Tyson Foods, Inc.*, 919 A.2d 563, 602 (Del. Ch. 2007) ("[N]ominal damages are appropriate only where the shareholder's economic or voting rights have been injured."); *In re J.P. Morgan Chase & Co. S'holder Litig.* (*J.P. Morgan Chase II*), 906 A.2d 766, 774 (Del. 2006) ("[T]he plaintiffs' entitlement to seek nominal damages depends upon whether their complaint alleges the type of deprivation of the [company] stockholders' economic interests or impairment of their voting rights, that would be cognizable under [*In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 331 (Del. 1993), *as corrected* (Dec. 8, 1993), *and disapproved of on other grounds by Tooley*, 845 A.2d at 1035], as limited by *Loudon* [*v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 141 (Del. 1997)]."). And Overwell has not alleged any actions that deprived it of its economic or voting rights, apart from the complete loss of its investments.

But Giedraitis does not press this specific issue. Nor does the Court need to in order to address the present motions. For Giedraitis argues that even claiming nominal damages, Overwell cannot possibly establish the requisite amount in controversy for this Court's subject matter jurisdiction. Giedraitis has taken the Court's previous finding—that Overwell had not sufficiently pleaded damages to sustain its aiding and abetting claim—and refashioned it into a jurisdictional issue. Trading Technologies again contends that the second amended complaint does not sufficiently allege damages.

Upon further consideration, the Court believes it erred in its previous analysis regarding damages. The Court required Overwell to show that it would have recouped some value from a

---

Court will apply Delaware law to analyze the aiding and abetting breach of fiduciary duty claim. *Schartz v. Parish*, No. 16 C 10736, 2016 WL 7231613, at *3 (N.D. Ill. Dec. 14, 2016) ("[T]he aiding and abetting claim cannot exist without the underlying allegation of breach of fiduciary duty, which is governed by Wisconsin law. Thus, the aiding and abetting breach of fiduciary duty claim falls within the internal affairs doctrine and is governed solely by Wisconsin law[.]"); *see also CDX Liquidating Tr.*, 640 F.3d at 219–20 (applying Delaware law under internal affairs doctrine to aiding and abetting breach of fiduciary claims).

higher sale price as an individual shareholder. But the Court should have analyzed damages by looking at what Neurensic hoped to recover as a company. This flows directly from a separate question that the Court and the parties previously glossed over: does Overwell brings these claims directly as an individual, derivatively as a shareholder, or both? *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) ("Determining whether an action is derivative or direct is sometimes difficult and has many legal consequences, some of which may have an expensive impact on the parties to the action."). For having determined that Overwell does not allege any individual claims—or if it does that those claims must be dismissed—Overwell is left with Neurensic's claim and the Court must consider damages from Neurensic's perspective. *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Ward*, 563 F.3d 276, 288 (7th Cir. 2009) ("The American legal system . . . view[s] a shareholder derivative action 'as a suit to enforce *a corporate cause of action* against officers, directors, and third parties.'" (citation omitted)).

Accordingly, the Court first addresses whether Overwell has sufficiently alleged individual or derivative claims. Second, the Court addresses Trading Technologies' arguments as to whether Overwell has sufficiently pleaded damages. Because Giedraitis' jurisdictional argument relies on the Court's previous damages decision, the Court then addresses Giedraitis' argument that Overwell has not sufficiently established the $75,000 amount in controversy requirement.

## I. Direct or Derivative Claims

Overwell states that it brings this action both individually and derivatively on behalf of Neurensic. This has almost no bearing on the Court's analysis since the Court looks at the substance of the claims, rather than the parties' characterization of them. *Tooley*, 845 A.2d at

1035 ("Plaintiffs' classification of the suit is not binding." (citation omitted)). Determining whether a stockholder's claim is derivative or direct turns on: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033.

Here, the majority of the allegations against Widerhorn and Giedraitis involve mismanagement of Neurensic. Overwell alleges that they failed to pay taxes and wages, failed to conduct proper bookkeeping, and that they failed to enforce restrictive covenants against former employees who began working for Trading Technologies before Neurensic's sale was complete. As Overwell puts it, "Widerhorn and Giedraitis could not unwind those actions," Doc. 99 ¶ 6, and this, together with the company's dire financial situation, essentially forced an unfavorable sale for only $400,000 in cash. These are derivative claims because Widerhorn and Giedraitis' actions directly harmed the company. *See Thornton v. Bernard Techs., Inc.*, C.A. No. 962-VCN, 2009 WL 426179, at *3 (Del. Ch. Feb. 20, 2009) ("Plaintiffs complain of quintessential director mismanagement and any recovery would be for the benefit of the corporate entity[.]"); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ. A. 762-N, 763-N, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) ("Essentially, this [is] a claim for mismanagement, a paradigmatic derivative claim."). Any harm that Overwell suffered because of the mismanagement is a derivative of the injury to Neurensic. *See Tooley*, 845 A.2d at 1036 (noting approvingly that "the inquiry should be whether the stockholder has demonstrated that he or she has suffered an injury that is not dependent on an injury to the corporation").

Overwell also makes allegations that could conceivably give rise to a direct claim. Specifically, Overwell alleges that Widerhorn and Giedraitis made false representations to

9

stockholders regarding the company's finances, that they failed to tell stockholders that Trading Technologies had hired Neurensic employees before the sale, and that they "fail[ed] to adequately apprise the stockholders of the competitive, if not superior, offer submitted by Overwell." Doc. 23 ¶ 79. Allegations involving a failure to disclose information can sustain individual shareholder claims if they implicate the right to a fully informed vote. *See Thornton*, 2009 WL 426179, at *3 (finding "failure to disclose accurate balance sheets" prevented shareholders from making an informed vote in board of directors election and was a direct, rather than derivative, claim); *Tyson Foods*, 919 A.2d at 601 ("Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote-the harm suffered is almost always an individual, not corporate, harm."). Here, however, Overwell does not allege that Widerhorn and Giedraitis' actions prevented Overwell from exercising an informed vote, either as a board member, or as a shareholder. Indeed, Overwell concedes that it did not even attend the October 5 board meeting to vote on the sale to Trading Technologies. And Overwell has not otherwise alleged that Widerhorn and Giedraitis' actions injured a right it held as a shareholder. *Tyson Foods*, 919 A.2d at 601 ("For a shareholder (or, as here, a class of shareholders) to maintain a direct claim, he or she must identify an injury that is not dependent upon injury to the corporation."). Even if it could show that Widerhorn and Giedraitis infringed its rights as a shareholder, it could not maintain a claim without also pleading damages flowing directly from those specific actions. *See In re J.P. Morgan Chase & Co. S'holder Litig.* (*J.P. Morgan Chase I*), 906 A.2d 808, 825–27 n.61 (Del. Ch. 2005)) ("In order for the plaintiffs' request for compensatory damages arising from a violation of the duty of disclosure to survive a motion to dismiss, the court must find that the plaintiffs have set forth in a well-pleaded complaint allegations to support those damages."), *aff'd*, 906 A.2d 766 (Del. 2006). As already

10

discussed, Overwell has not alleged that the Widerhorn and Giedraitis injured its economic or voting rights so as to sustain a request for nominal damages. *Tyson Foods*, 919 A.2d at 602 ("[N]ominal damages are appropriate only where the shareholder's economic or voting rights have been injured.").

The situation is similar to that of *J.P. Morgan Chase I*, 906 A.2d 808. In that case, shareholders of J.P. Morgan Chase bank brought derivative claims against the bank's directors for breach of fiduciary duty after a merger with another bank. *Id.* at 812. The central claim was that the directors had refused a more favorable deal, one that did not involve issuing stock to the other bank's shareholders at a premium. *Id.* They also alleged that the directors failed to disclose this alternative no-premium offer to the bank's shareholders. *Id.* at 814.

The court held that claims against the board for refusing a better deal were derivative because a less favorable deal harmed the company first. *Id.* at 818. The court found that failing to disclose the more favorable deal to shareholders was also a derivative claim:

> The issue the court sees is whether this purported class-based disclosure claim can exist as a claim for money damages apart from the underlying derivative claim. This issue is particularly framed by the fact that the damages allegedly flowing from the disclosure violation are exactly the same as those allegedly suffered by JPMC in the underlying claim.
>
> The disclosure claim alleged by the plaintiffs . . . if proven, could have supported a claim for equitable relief. . . . Now, of course, the "eggs" have been irretrievably "scrambled" and there is no possibility of effective equitable relief.
>
> Because equitable relief is no longer practicable, the plaintiffs present their disclosure claim as one seeking money damages. There are several problems with this approach. In order for the plaintiffs' request for compensatory damages arising from a violation of the duty of disclosure to survive a motion to dismiss, the court must find that the plaintiffs have set forth in a well-pleaded complaint allegations to support those damages. But, for the reasons already discussed, the court concludes that the injury

11

> alleged in the complaint is properly regarded as injury to the
> corporation, not to the class, and the damages, if any, flowing from
> that alleged breach of fiduciary duty belong to the corporation, not
> to the class. How then could the same directors ever be liable to
> pay actual compensatory damages to both the corporation and the
> class for the same injury? The answer . . . is that they could not.

*Id.* at 825–26. Similar to *J.P. Morgan Chase I*, Overwell had a claim for equitable relief before the Neurensic sale was complete, and the Court granted its request for a stay until Neurensic provided shareholders with sufficient notice. But now, "equitable relief is no longer practicable" and Overwell seeks money damages for injuries that flow derivatively from harm to the company. *Id.* Because Overwell has not shown that its rights were infringed, or that it suffered damages apart from the company, there is no direct claim.

Having established that Overwell only alleges derivative claims against Widerhorn and Giedraitis, its claims against Trading Technologies for aiding and abetting Widerhorn and Giedraitis' breach of fiduciary duties must also be derivative. *See Feldman v. Cutaia*, 956 A.2d 644, 662 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008) ("[A]n aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself."). Having determined the nature of Overwell's claims, the Court now turns to the Defendants' respective motions.

## II. Trading Technologies' Motion to Dismiss

The Court previously found that Overwell had pleaded itself out of court because it could not show it suffered any damages. The Court reasoned that given Neurensic's outstanding debt of $3.5 million, it was not plausible that Overwell would have "increase[d] its offer by more than eight times in order to derive any value for the shareholders." Doc. 93 at 15. Overwell subsequently filed its second amended complaint, wherein it alleges that Neurensic's debts may have been as low as $1.5 million or less given that a full audit has still not been completed. Overwell also alleges that it intended to bid up to $1.5 million "based on the value of the

12

technology and in order to protect its $3.5 million investment." Doc. 99 ¶ 68. Trading Technologies moves to dismiss again, arguing that Overwell has still failed to allege that Neurensic's sale price could have plausibly exceeded the company's debts. Thus, according to Trading Technologies, Overwell has no hope of recovering its losses and it cannot show any damages.

Having reconsidered this issue, the Court finds its prior analysis is mistaken and that Overwell need not allege that it suffered damages as an individual shareholder. As already established, Overwell brings a derivative, not an individual claim. Because this is Neurensic's cause of action, damages would be awarded to the company. *Int'l Union of Operating Eng'rs*, 563 F.3d at 288 ("The American legal system . . . view[s] a shareholder derivative action 'as a suit to enforce *a corporate cause of action* against officers, directors, and third parties.'" (citation omitted)); *J.P. Morgan Chase II*, 906 A.2d at 773 ("[D]amages must be logically and reasonably related to the harm or injury for which compensation is being awarded."). As such, the proper measure of damages is the harm to the company, not to the individual shareholders. *Id.* (explaining that "$7 billion damage figure would be a logical and reasonable consequence (and measure) of the harm caused to [J.P. Morgan Chase]" in derivative suit alleging the company overpaid for merger with another bank, but it had "no logical or reasonable relationship to the harm caused to the shareholders *individually* for being deprived of their right to cast an informed vote").

Here, Overwell alleges that Neurensic had a value between $6 to $12 million, and that because of Widerhorn and Giedraitis' mismanagement, the company sold for $400,000 cash. As previously discussed in this Court's January 31, 2019, Opinion, Overwell alleges that Trading Technologies aided the leadership's actions by hiring key employees from Neurensic and

13

facilitating the transfer of Neurensic's proprietary assets before the completion of the sale. "[A]ware of the financial distress of the Company," Trading Technologies aided and abetted the wrongful behavior and, in essence, helped ensure that the sale was a *fait accompli*. Doc. 99 ¶ 8–9. Even if the diminished bidding price was the limit of damages attributable to Trading Technologies, Overwell has pleaded that it intended to bid $1.5 million. Because this is a derivative suit, it does not matter if Overwell would have bid more than the company's liabilities in order to recoup its own investment. It only matters that Neurensic could have extracted a more favorable sale price than it did.

Trading Technologies argues that it is speculative to allege that Overwell would have bid $1.5 million for Neurensic, and that these are the type of "'naked assertions' devoid of further 'factual enhancement'" that *Iqbal* prohibits. Doc. 103 at 6. The Court does not agree. Overwell had already invested $3.5 million in Neurensic and has alleged that the company was worth up to $12 million accounting for the value of the technology, the cost of assembling a comparable team of engineers, as well as the customer base and subscriptions that were either imminent or already in place. Even if the Court were to only look at the value of the technology, which Widerhorn and Giedraitis themselves placed at $2.5 million, a bid of $1.5 million for the entire company does not seem implausible.

More importantly, Overwell need not show it would have bid $1.5 million, but only that it may have plausibly bid north of $400,000. Considering the value of Neurensic's assets, this is not speculative in the same way as the cases to which Trading Technologies points. *Cf. Aliano v. WhistlePig, LLC*, No. 14 C 10148, 2015 WL 2399354, at *5 (N.D. Ill. May 18, 2015) (once plaintiff-restaurant was aware that defendant's whiskey was mis-branded, its claim that customers would stop patronizing restaurant because they wanted to purchase whiskey and could

14

not, or customers were appalled that restaurant continued to sell the product, were "rank speculation regarding future customer behavior"); *Messina v. Vill. of Villa Park, Ill.*, No. 13 C 00405, 2014 WL 4923610, at *4 (N.D. Ill. Sept. 29, 2014) (police officer's claim that he "los[t] valuable job opportunities" because of public comments about his job performance were "entirely conclusory" and failed to plausibly allege that he had been blacklisted, or that it was "virtually impossible for him to find new work in his field"); *Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 881 (N.D. Ill. 2014) (plaintiff's claims that she was injured by cyber-attack were too speculative because she could not establish that her information was compromised or stolen); *United Labs., Inc. v. Savaiano*, No. 06 C 1442, 2007 WL 4557095, at *7 (N.D. Ill. Dec. 21, 2007) (plaintiff's claim that it might not be able to obtain insurance coverage because insurance policies were not delivered on time was speculative, since plaintiff "ha[d] only alleged the existence of potential damages at some future point in time"). Even if the wrongful conduct only dampened the bidding process by $100,000, that is enough to survive a motion to dismiss. Overwell has plausibly alleged at least this much.

Trading Technologies also argues that Overwell has not sufficiently pleaded proximate cause. It argues, for instance, that Overwell has not alleged that the employee and technology transfers to Trading Technologies dampened what Overwell was willing to bid on the company. Overwell need not connect all of the dots with certainty to survive a motion to dismiss. All it must allege is "a plausible claim for relief," *Iqbal*, 556 U.S. at 679, after which it "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint," *Twombly*, 550 U.S. at 563 (citation omitted). It is not much of a stretch to believe that once Neurensic employees had defected to Trading Technologies—something that Kenneth Chu brought up at a board meeting several weeks before Overwell placed a bid—prospective bidders may have been

less enthusiastic about acquiring the company if they thought its proprietary software was compromised. Trading Technologies may raise these arguments again at summary judgment. At this stage of the proceeding, Overwell has sufficiently pleaded its claim.

For these reasons, Overwell may proceed with its claim of aiding and abetting breach of a fiduciary duty.

### III. Giedraitis' Motion to Dismiss

#### A. Diversity

Giedraitis first argues that since Neurensic and Trading Technologies are both Delaware corporations, there is a lack of complete diversity necessary for this Court's subject matter jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) ("In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action."). But where shareholders sue on behalf of a corporation that is controlled by managers hostile to the derivative suit, courts treat the corporation as a defendant. *Beck v. Dobrowski*, 559 F.3d 680, 687 (7th Cir. 2009) ("A corporation is controlled by its management, and when the management opposes the derivative suit the corporation is treated as a defendant rather than as a plaintiff for purposes of determining whether there is diversity jurisdiction."). Although Overwell brings Neurensic's cause of action, it does so "as a 'next friend' might do for an individual, because it is disabled from protecting itself." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 523, 67 S. Ct. 828, 91 L. Ed. 1067 (1947). "In effect, this suit is a revolt by [a] shareholder[] against the members of the board that engineered [Neurensic]'s sale to [Trading Technologies]." *Beck*, 559 F.3d at 687. As such, the Court considers Neurensic a defendant for determining diversity, and Neurensic's

shared state of incorporation with Trading Technologies does not extinguish this Court's jurisdiction. *Id.*

**B. Amount in Controversy**

Giedraitis also argues that this Court lacks subject matter jurisdiction to hear Overwell's claim. Giedraitis relies on this Court's January 31, 2019, Order, finding that Overwell did not plausibly suffer any damages from the Neurensic sale. Therefore, Giedraitis argues, Overwell's potential recovery is limited to nominal damages, and because nominal damages cannot possibly exceed $75,000, Overwell has not met the amount in controversy requirement.

As already explained, Overwell is not limited to nominal damages because it can claim compensatory damages on behalf of Neurensic. *Koster*, 330 U.S. at 523 ("[P]laintiffs' possible recovery is not the measure of the amount involved for jurisdictional purposes but [instead] the test is the damage asserted to have been sustained by the defendant corporation."). Overwell alleges that Neurensic was valued at as much as $12 million and that Giedraitis' mismanagement led to its ruin. This is far beyond the $75,000 amount in controversy requirement. At the very least, Overwell has pleaded that Giedraitis' actions deflated Neurensic's sale price, and that more competitive bidding could have reaped hundreds of thousands more for the company.

Giedraitis also makes much of Overwell's failure to attach any affidavits or proof to counter his factual challenge to the Court's subject matter jurisdiction. *McMillian v. Sheraton Chicago Hotel & Towers*, 567 F.3d 839, 845 (7th Cir. 2009) ("[W]hen the amount in controversy is contested, the parties asserting federal jurisdiction must come forward with competent proof that they have satisfied the jurisdictional threshold and not simply point to the theoretical possibility of recovery for certain categories of damages."). But Giedraitis does not argue that the company itself was damaged less than $75,000. Even the supporting documents he submits

17

establish that the total damage could have easily exceeded $75,000.  *See* Doc. 106-1 at 28

("[E]ven with the amortization cost, the book value of the technology assets is approximately

$2.5 [million].").  Therefore, Overwell was not obligated to submit additional proof to refute

Giedraitis' factual attack.  *McMillian*, 567 F.3d at 845.  Overwell's claims sufficiently allege the

amount in controversy requirement, and this Court has jurisdiction to hear the case.

## CONCLUSION

For the foregoing reasons, the Court denies Trading Technologies' motion to dismiss [103], and the Court denies Giedraitis' motion to dismiss [106].

Dated: September 9, 2019

_____
SARA L. ELLIS
United States District Judge