1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4    OVERWELL HARVEST LIMITED, a          )   No. 17 C 6086
     British Virgin Islands company,      )
5                                         )
                  Plaintiff,              )
6                                         )
            vs.                           )   Chicago, Illinois
7                                         )
     DAVID WIDERHORN and PAUL             )
8    GIEDRAITIS,                          )
                                          )   September 7, 2017
9                 Defendants.             )   3:00 p.m.

10              TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HON. SARA L. ELLIS

12
     APPEARANCES:
13
     For the Plaintiff:      MR. JOHN J. SCHARKEY
14                           MR. ROBERT D. SWEENEY
                             Sweeney & Scharkey LLC,
15                           111 West Washington Street, Suite 1160,
                             Chicago, Illinois  60602
16

17   For the Defendants:     MR. WILLIAM CHOSLOVSKY
                             MR. MICHAEL J. NEVILLE
18                           Fox Rothschild LLP,
                             353 North Clark Street, Suite 3650,
19                           Chicago, Illinois  60654

20

21

22

23
                        PATRICK J. MULLEN
24                    Official Court Reporter
                   United States District Court
25           219 South Dearborn Street, Room 1412
                    Chicago, Illinois 60604

1    THE CLERK:  2017 C 6086, Overwell Harvest Limited

2  versus Widerhorn, et al.

3    MS. SCHARKEY:  Good afternoon, Your Honor.  John

4  Scharkey, S-c-h-a-r-k-e-y.  I represent the plaintiff, Overwell

03:07:26    5  Harvest Limited.

6    MR. SWEENEY:  Robert Sweeney, S-w-e-e-n-e-y, also on

7  behalf of plaintiff.

8    MR. CHOSLOVSKY:  Good afternoon, Judge.  Bill

9  Choslovsky and Mike Neville on behalf of the defendants.

03:07:35    10    THE COURT:  All right.  Good afternoon.  So we are

11  here on the continued TRO.  I read the reply that the plaintiff

12  filed along with the exhibit.  All right.  So having read

13  everything, I have some specific questions.  It's my

14  understanding that it's the defendants' position that the

03:08:07    15  August 16th e-mail constituted sufficient notice of a

16  stockholder meeting to vote either under Delaware law or the

17  bylaws, but then there is an August 23rd e-mail from

18  Mr. Widerhorn that states:

19    "When it comes time to vote on the final asset

03:08:36    20  purchase agreement terms, we will do so with the proper notices

21  and formalities stipulated by our bylaws and Delaware law."

22    So if the August 16th e-mail constituted sufficient

23  notice, why on earth would Mr. Widerhorn say:  When it comes

24  time to vote, we will do it with proper notice?

03:09:03    25    MR. CHOSLOVSKY:  Judge, a couple responses.  Number

1  one, yes, it is our formal legal position that notice was given

2  on the August 16th date as you said.  Our second position, we

3  have two other things to say in that regard.  Number one, then

4  after that in an abundance of caution on August 25th, he sent

03:09:31  5  another notice to all shareholders giving a deadline to vote

6  and stating:

7  　　　　"I am pleased to announce that TT has considerably

8  improved the terms of the transaction."

9  　　　　So the short answer to your question is on August

03:09:47  10  25th, even if you're going to neglect the August 15th notice,

11  no later than August 25th notice was given.

12  　　　　Now, there's two other --

13  　　　　THE COURT:  Well, so then your answer to my question

14  is that the August 16th e-mail didn't constitute proper notice.

03:10:09  15  　　　　MR. CHOSLOVSKY:  All right.  My answer is if it didn't

16  constitute proper notice that the --

17  　　　　THE COURT:  Well, no, it's either it did or it didn't.

18  So you're going to take a position that:  Yeah, it did, and

19  here's why it constituted proper notice.

03:10:22  20  　　　　Then, you know, you can say:  I don't know why he sent

21  that e-mail afterwards, but it did.

22  　　　　To me, it makes no sense, the later e-mail on August

23  23rd which says:  When it comes time to vote, I'm going to give

24  everybody proper notice, and I'm going to do everything in

03:10:43  25  accordance with the bylaws and Delaware law.

1    MR. CHOSLOVSKY:  He did the -- so the short answer is,
2    no, notice was not sufficient on August 15th.
3        THE COURT:  Okay.
4        MR. CHOSLOVSKY:  On August 25th, formal notice was
03:10:58  5    given.  The more important part of the discussion is that it's
6    ultimately a red herring.  It's ultimately irrelevant.
7        THE COURT:  It's not a red herring.  If on August
8    25th, if we start the clock on August 25th, then the vote on
9    September 5th is premature.  It's 20 days.  The notice is 20
03:11:32  10    days.  So if the August 25th e-mail constitutes proper notice,
11    and I don't know if that's plaintiff's position or not, then
12    August -- I'm sorry -- September 5th falls before the 20-day
13    notice period and the vote is not proper.
14        MR. CHOSLOVSKY:  When you say the vote is not proper,
03:11:59  15    Your Honor, it's no different than our presidential election.
16    If you can vote until September 15th, if you choose to vote one
17    second later, there's two components to that.  Number one, 97
18    percent of the eligible votes were cast.
19        THE COURT:  You can't.  That's not how the law reads,
03:12:23  20    right?  It's not -- the notice is not that it's open voting.
21    So here's the notice, and you can vote anytime up until 20
22    days.  The notice has to say here's the date when the vote is
23    going to occur, the time when it's going to occur, the place
24    that it's going to occur, and the means by which it is going to
03:12:52  25    occur.  It's not open season.  There's no such thing as early

1    voting.  You can't do that.

2           So the fact that 97 percent of the -- this poll is

3    somewhat ambiguous to me as to whether that is a vote, not a

4    vote, a suggestion as to what people think.  I'm not sure what

5    that is, but the bylaws and Delaware law don't say anything

6    about allowing early voting.  What they do say is that you have

7    this 20-day notice period and at that point that's when you can

8    set the vote.  September 5th, even taking August 25th as the

9    notice date, September 5th is too early.

10          MR. CHOSLOVSKY:  Well, we have the order that we

11   entered by agreement on August 24th, and I think this is

12   particularly relevant.  What's going on here is the company,

13   Neurensic, is attempting to sign a non-binding term sheet, a

14   non-binding term sheet.  So even if -- arguably, this order

15   doesn't even stop that, because the August 24th order that we

16   entered by agreement says two things, number one:

17          "No sale of the company's assets shall take place in

18   the next 14 days."

19          That did not happen.

20          The second thing it says is:

21          "In the event any offer is made to purchase all or

22   substantially all of the company's assets" -- which happened --

23   "defendants shall provide all notices and disclosures required

24   under the company's bylaws and applicable Delaware law."

25          They did that on August 25th.  So when we really cut

03:15:28

1   to the chase, it almost strikes me as falling under the heading

2   of no good deed goes unpunished.  Anybody is still welcome to

3   vote.  I mean, the remaining 3 -- I mean, it falls under the

4   heading of a folly.  The remaining 3 percent that hasn't voted,

5   no sale is going to take place before September 14th.  In fact,

6   we have an affidavit that was sent over by the folks from the

7   potential buyer which I'd like to introduce.  The most

8   significant point is they point out in there:

9        "To be clear, the term sheet does not complete the

03:15:48

10  transaction.  Instead, the proposed timeline for completing the

11  transaction is as follows:

12       "The term sheet executed by September 8, 2017" --

13  which again if we wanted to take an aggressive position, I

14  believe we could have done that at any juncture.

03:16:03

15       "2.  A binding purchase agreement executed by

16  September 13, 2017.

17       "3.  Closing meaning transaction is funded by

18  September 20, 2017."

19       So, you know, arguably what we're here talking about,

03:16:21

20  the term sheet is a non-binding term sheet that doesn't bind

21  the company in the first place.

22       THE COURT:  No, what we're talking about is a vote.

23  We're not talking about the term sheet.  We are talking about

24  the stockholder vote and the process by which any sale is going

03:16:40

25  to move forward.  That's what we're talking about, and it's

03:17:18

1    very clear in my opinion anyway -- and mine is really the only

2    one that counts -- that the two directors have not abided by

3    the notice provisions that they were supposed to abide by in

4    the bylaws and under Delaware law, and then by agreement said

5    they were going to abide by.  That's what it comes down to.

6            Holding the vote on September 5th, even if the notice

7    went out on August 25th, is not 20 days.  You can count it any

8    way you want to, and it's not 20 days.  That is the crux of the

9    TRO.  Now, Trading Technologies is most likely, as they have

03:17:59

10   been talking to Neurensic since May, right?

11           MR. CHOSLOVSKY:  Since May.

12           THE COURT:  So they're not going anywhere in reality.

13           MR. CHOSLOVSKY:  I hope you're right, Judge.

14           THE COURT:  They can, you know, set these particular

03:18:08

15   dates, but Trading Technologies is a business that has been

16   around a long time.  I've had cases with Trading Technologies

17   that have listed a long time, so I know that they're not going

18   anywhere.  They can certainly wait to ensure that the vote

19   occurs 20 days from August 25th and then can go forward.

03:18:39

20           There will not be irreparable harm to the defendants

21   in light of the fact that they have been talking to Trading

22   Technologies for months about this, but there is irreparable

23   harm if I allow this to go forward in violation of Delaware

24   law, in violation of the bylaws, and it could be that in the

03:19:07

25   end we get to the same result, right?

03:19:37

1    It can certainly be that Overwell doesn't have the
2  votes to stop the sale.  It can be that Overwell can't find
3  anybody else, can't find another buyer who would bring in more
4  money, and that's the whole point of this.  It's that the
5  plaintiffs have to have the ability under the law to make sure
6  that they've exhausted the ability to maximize any sale of the
7  company and get back or reap as much of their investment into
8  the company as possible.

03:20:13

9    It might very well be that Trading Technologies is the
10  best out there in terms of the sale, but Overwell needs to have
11  the opportunity to beat the bushes and get somebody else in so
12  that they don't take a loss.

03:20:37

13    MR. CHOSLOVSKY:  A couple things, Judge.  I would
14  like -- since this is an evidentiary hearing, I'd like to put
15  on a witness for you.  That's number one.  Number two, if your
16  premise is correct, we're foolish to be expending so much time
17  when all we need to do is renotice and give a few more days,
18  and then as you said perhaps we'll be in the exact same
19  position.  I'm just going to read to you one paragraph from

03:21:00

20  TT's affidavit.  The suggestion that it's self-serving, I hope
21  you're right.  They wrote:

22    "Practically speaking, the company represents a very
23  rapidly wasting asset for several reasons.  We understand that
24  most of the employees in place when TT submitted its indicative

03:21:17

25  offer in May are no longer employed by the company and that no

1   employee has been paid in several months.  Its customers are

2   aware that the company is rapidly facing a liquidation event

3   and is effectively out of business.  Nuerensic has also advised

4   TT that most of the contracts expire throughout the month of

03:21:37   5   September 2017 and it is highly probable that those customers

6   will not renew their accounts.  Hence, time is of the essence

7   to complete the contemplated transaction.  In the event that TT

8   is not able to complete the transaction immediately, then TT

9   will either, A, not complete the transaction at all and simply

03:21:55   10   build and deploy our own solution to the market or

11   alternatively, B, will very substantially reduce our price to

12   reflect the rapidly decreasing value of these orphaned assets."

13           I would like to put a witness on because the most

14   important factor, Judge, is yesterday -- and I'm going to put

03:22:18   15   it politely -- you were fed a bill of goods in this sense.  You

16   were told this case begins, that the complaint begins with

17   Exhibit A on August 15th, and then an August 18th, I think,

18   e-mail at 3:51 in the morning.  So August 15th, their complaint

19   begins as if this case begins on August 15th.

03:22:37   20           They are either so extremely misinformed or extremely

21   disingenuous -- and this is why I want to put on a witness --

22   that starting more than a year ago when the plaintiff invested

23   its second million dollars with a number of conditions, the

24   most important condition the plaintiff in July of 2016 insisted

03:22:56   25   on is that you sell the company as soon as possible.  Then more

1    than a year's worth of efforts went on in that regard.  I've

2    got a whole binder of the e-mails showing their client, A,

3    insisted the company be sold and, B, getting updates of all

4    these sales efforts, including the May 10th first offer by TT.

03:23:20    5    So the whole suggestion that this is premised on them being in

6    the dark borders on the frivolous, to put it politely.

7           THE COURT:  But we're here because there was no proper

8    notice given.  Had your clients given proper notice along the

9    way, whether it was August 16th, August 18th, whenever it was

03:23:55    10    back in May, we wouldn't be here.  We wouldn't be here.

11           MR. CHOSLOVSKY:  But the suggestion that they didn't

12    have notice, what we are calling proper notice is the

13    definition of form over substance.

14           THE COURT:  My point is that there are specific

03:24:12    15    requirements under the law and specific requirements in the

16    bylaws.  We can call it form over substance; however, they all

17    have a purpose.  If you don't meet it, then it's not notice.

18    Notice is not:  Hey, I'm kind of thinking about selling the

19    company to this guy.  What do you think?

03:24:46    20           It is:  We have an offer.  Here are the terms.  Here's

21    when the vote is going to take place.  Here's all the

22    information you need to decide on the vote.  Here's the where,

23    the when, and the how of the vote.

24           MR. CHOSLOVSKY:  And, Judge, this is worth reading to

03:25:13    25    you.  On August 25th, our client sent the following e-mail to

1   the plaintiff and all the shareholders:

2        "I'm pleased to announce that TT has considerably

3   improved the terms of the transaction after our meeting today

4   and has submitted their best and final term sheet which I

03:25:28  5   attached below.  Unfortunately, TT has set a deadline of

6   Tuesday to accept and has explained to me unequivocally that

7   there is no leniency in this.  The term sheet provides a

8   reasonable closing price."

9        Then he goes through the terms.

03:25:42  10       "I have instructed our attorneys to reach out to OHL's

11   attorneys" --

12       THE REPORTER:  Counsel, it's too fast.

13       MR. CHOSLOVSKY:  "I have instructed our attorneys to

14   reach out to OHL's attorney and request an emergency board

03:25:52  15   meeting to consider and vote on the term sheet and, if

16   successful, to dismiss the current injunction.  Furthermore,

17   assuming we are successful in reaching board approval, so this

18   weekend, management will be available on Monday to respond to

19   any questions and concerns."

03:26:07  20       Then he continues, and this is in bold:

21       "It is extremely important that all shareholders vote

22   ASAP" --

23       THE REPORTER:  Counsel, it is too fast.

24       MR. CHOSLOVSKY:  Okay.

03:26:16  25       "It is extremely important that all shareholders vote

1   ASAP once the polling opens even if the majority needed to pass

2   the vote is reached.  Under normal conditions, Delaware law and

3   the bylaws require 20-day notice to vote.  However, given the

4   timetable enforced by TT, once the term sheet is accepted, we

03:26:39   5   need to close within 14 days or the deal will be permanently

6   canceled.  To accomplish this, we need to have everybody who is

7   a shareholder's vote counted within the 14 days regardless of

8   whether it is in favor or against.  Otherwise, we will have to

9   wait until September 14, 20 days from today's official notice,

03:27:02   10   to officially close the deal, assuming, of course, at least a

11   majority of the votes has voted, and TT may not be willing to

12   do so.  We will follow up after the OHL board meeting with the

13   link to the electronic polling for voting as well as the open

14   phone dial-in for questions to management."

03:27:22   15          THE COURT:  In hearing all of that, they got some bad

16   advice.  You know, it says in the attachment to your response:

17          "Written notice of a stockholder vote and all material

18   facts concerning the proposed transaction was disclosed in an

19   e-mail communication on August 25 setting the deadline for

03:27:55   20   stockholders to vote on the proposed transaction on September

21   14, 2017."

22          That was 20 days.  That's when the vote should have

23   occurred.  Instead, your clients decided to hold the vote on

24   September 5th.  They knew, certainly after having been in the

03:28:21   25   courtroom on our first hearing, that the issue was this 20-day

1  notice, and then they enter into an agreement with Trading

2  Technologies that requires them to hold the vote before 20 days

3  and close.  That's stupid.

4         MR. CHOSLOVSKY:  It's at TT's insistence.

03:28:51   5         THE COURT:  It's a negotiation, right?  There are

6  things that are non-negotiable in different negotiations.

7  Certainly, they could have gone to TT and said:  We can't do it

8  before September 14th, particularly because we were just in

9  court on this very issue.

03:29:15  10         They could have through counsel reached out to the

11  lawyer for Overwell and said:  Look, this is it.  This is the

12  best we can do.  Trading Technologies is going to walk.  Would

13  you agree?  You've been given the notice.  Would you agree to

14  hold the vote on September 5th?  Here's everything.  Here's all

03:29:46  15  the information.  Let's settle this case.

16         That could have been done, too, but it wasn't done.

17  So, you know, I just don't see where defendants have a leg to

18  stand on when it comes to the notice.

19         MR. CHOSLOVSKY:  The notice, I mean, if we really cut

03:30:15  20  to the chase and I say, Judge, let's assume notice was not

21  proper, that there's no way that September 5th is the same as

22  September 15th, and it's not proper even if you reset the clock

23  as of August 25th, we're here on a TRO.  They still have to go

24  four for four and show irreparable harm and an inadequate

03:30:40  25  remedy at law.

03:30:58

1         Now, this is a company.  Again, I'm happy to put on

2  the founder of the company, the wiz kid who graduated from MIT

3  at the age of 19.  I'm happy to put him on, and we can walk

4  through the corporate documents which they've never even

5  suggested are inaccurate that the founder controls way more

6  than 90 percent of the vote.  So the notion of -- we could have

7  notice on a gold-sealed old-fashioned embossed something, and

8  we could do it with trumpets and we could give 200 days.

03:31:21

9         THE COURT:  I'm not asking for trumpets.  I'm not

10  asking for anything to be embossed by a gold seal or anything

11  else.  I am asking, as are plaintiffs, that the defendants

12  follow what they are required to do by law.  That's all.

13         MR. CHOSLOVSKY:  So where are the damages?

03:31:44

14         THE COURT:  The damages are that if they do not have

15  the full 20 days, they are losing the time and the ability to

16  find other buyers, better buyers.  If at the end they don't

17  find them, then they don't find them, but they are entitled to

18  that under Delaware law.  That's what they're entitled to.

03:32:11

19         MR. CHOSLOVSKY:  And if it's futile, I appreciate the

20  candor of telling me, but I'm prepared to put on a witness

21  stating they've had 400 days to find an offer.  They're the

22  ones who insisted the company be sold.  Again, it's the epitome

23  of misinformation.  We can go through the e-mails showing that

24  as a condition to put forward their second million dollars,

03:32:40

25  they said you must immediately try to sell the company.  That

1  was 14 months ago.

2         THE COURT:  What you're asking me to do is basically

3  say:  It really doesn't matter what the requirements are under

4  Delaware law.  You know, if you could have found a buyer, you

03:33:03  5  should have done that before today.  You haven't done it, so

6  too bad for you, and the requirements under Delaware law don't

7  mean anything.

8         The last time I checked, I'm a judge, and it is my

9  obligation, even if the result will end up the same, to make

03:33:25  10  sure that people meet their obligations under the law.  Your

11  clients certainly by August 25th knew what their obligations

12  were, and the fact that they chose to hold a vote before 20

13  days is on them.  There were other things they could have done,

14  and they chose not to do that.  You can't get around it.  Under

03:34:05  15  the likelihood of success on the merits, the plaintiffs are

16  likely to succeed on that claim.

17         MR. CHOSLOVSKY:  They have to show damages, and they

18  have to show an inadequate remedy at law.

19         THE COURT:  Exactly, and the damages is that -- first

03:34:25  20  of all, there is jurisdiction.  It meets the jurisdictional

21  amount.  There are damages, and there is an inadequate remedy

22  at law in that if they are denied the ability to have those

23  extra days to find a buyer, they can't get that back.  So you

24  can't redo the vote or redo what was done and go backwards.

03:35:02  25  They can't do that.

1        MR. CHOSLOVSKY:  So if I could show you as a
2   metaphysical certainty that the harms here, the weighing of the
3   harms, on the one hand, the harm is if you take TT's affidavit,
4   which is that they're going to walk, and I'll put my client on
03:35:20    5   stating they're going to walk and that's why he shorthand the
6   notice, not because he wanted to, but because he had a gun to
7   his head and was told:  This is the deal or else.  Why should
8   we pay for something we could get for free?

9        So if I can prove as a metaphysical certainty to you
03:35:40   10   that on the one hand this deal will evaporate, so that's the
11   harm to the defendants, that taxes won't be paid, back wages
12   won't be paid, that these assets will generate zero as a
13   result, that versus on the other hand their harm when they only
14   control less than 5 percent of the votes, so they couldn't stop
03:36:03   15   a sale even if they wanted to, that in that instance somehow
16   the harm weighs -- and that they have to go four for four, that
17   the harm weighs in favor of them, I am prepared to put on a
18   witness to make that showing.

19        THE COURT:  You can put on the witness if you want to.
03:36:21   20   I never stop anybody from making their full case, and you can
21   certainly put the witness on.

22        What would plaintiffs like to address in terms of
23   irreparable harm and an adequate legal remedy?

24        MS. SCHARKEY:  Your Honor, in terms of the irreparable
03:36:43   25   harm, in addition to what Your Honor has articulated, it's the

1    proprietary nature of the technology.  If the plaintiffs can

2    put together a consortium of investors that can outbid TT and

3    they don't have that opportunity, they're deprived of that,

4    too.  That cannot be quantified.  You can't give that back with

5    money.  That's gone.  So that's an additional dimension of the

6    irreparable harm that we'll suffer if this relief is not

7    granted.

8         MR. CHOSLOVSKY:  So, Judge, trying to be a pragmatist,

9    I have a different question.  If the notice runs as of August

10   25th to take you to September 15th, again since this

11   transaction will never be -- a purchase agreement won't even be

12   signed before then, is there any reason we can't extend the

13   period of voting through September 15th?

14        I mean, they've been on notice of this.  Again, if I

15   put on testimony, they've been on notice because it's been at

16   their demand to sell the company for 400 days.  They've been on

17   notice since May 10th that TT has made an offer, and nothing

18   has been done.

19        So to smoke out that this is again a hostage or

20   extortion action, they've known since August 25th.  So is there

21   any reason we can't say the vote closes September -- the vote,

22   which again they control less than 5 percent of the votes, that

23   the vote closes September 15th?

24        Great, nobody would love to see them after 400 days

25   find a higher and better offer.  If that's the case, that's

1   something we would consider because there's no reason to try to

2   make a case if the answer is, sure, let's extend the voting to

3   September 15th.

4           MR. SWEENEY:  On that point, Your Honor, I'll make a

5   couple points.  First, I think the affidavit he just read said

6   that there would be a sealed agreement on September 13th.

7   That's what the affidavit that I think he just read said.

8   Beyond that, this is not something Overwell can waive.  There

9   are 23 shareholders.  Now, we're the ones that have jumped up

10  and said we want our 20 days' notice, but we can't just come in

11  here and say don't apply Delaware law.  We've got 12 other

12  shareholders that never voted in the poll.

13          Secondly, as you point out, this is not something

14  where you can just leave it open.  There's a reason why we have

15  rules with regard to quorums.  You have to have a quorum.  If

16  you've just got an open poll, you know, was there a quorum?

17  Well, there wasn't one on Monday or Tuesday or Wednesday when

18  they voted, but there was on Thursday.  That's not how it

19  works.  You have to show up with proxies.  You have to have the

20  votes represented at the meeting.  Like you said, it has to be:

21  Here's what the vote is going to be about.  Here's the

22  resolution.  Here's the date, here's the time, and here's how

23  we're going to do it.

24          If they're going to do it remotely, we have to -- I

25  mean, there's so many provisions of these bylaws that they

1    violated.  1.6 says they have to leave a list on an electronic

2    network where everyone can see the shareholders that are voting

3    during the course of the meeting.  That never happened.  The

4    quorum section says it has to have date, time, and place, and

03:40:07    5    we have to have proxies in writing.

6         I mean, there's at least four sections in the bylaws

7    that we pointed out to them before today that they were in

8    violation of.  We were in the hallway yesterday, and when we

9    came up to you we were surprised because we thought they're

03:40:20    10    going to give a proper notice now, we're going to have our 20

11    days, and that will be it.  Instead, what happened was someone

12    wanted to have a hearing.

13         This is not a complicated case in terms of the notice

14    part.  There might be a lot of other complicated issues down

03:40:40    15    the road, but the notice part is not complicated.  They haven't

16    complied, and we don't agree frankly that -- I mean, we're not

17    looking to complicate things, but the August 25th e-mail does

18    not say how, when, where, why a meeting is going to take place.

19    I mean, it's hard to believe.  They read it, but he flat out

03:40:57    20    said "however, given the timetable, once the term sheet is

21    accepted, we need to close within 14 days," essentially

22    admitting that this isn't adequate notice.  This is not what

23    you need.

24         Now, what we were going to put on if the case came

03:41:12    25    about -- and it's referenced in the papers -- was there were

1    directors' meetings where Mr. Widerhorn did send around WebEx

2    call-in numbers, WebEx ID numbers that you had to put in,

3    security numbers that you had put in to have the call, the date

4    and time, not only in Chicago time but Hong Kong time.  He did

03:41:35    5    provide proper notice of those.  He knows how to do it.  It

6    just hasn't happened.

7              Frankly, our guys have put up $3.5 million.  So, yes,

8    we've known that they're trying to sell it, but what surprised

9    everybody was when on August 16th we were told it's going to be

03:41:57    10    sold for about 2 to 400 grand.  That's 10 percent of our

11    investment, a million dollars of which we put up in February of

12    this year.  So might these people be interested in saying

13    first:  Slow down.  What's happening?  We need to know what's

14    going on.

03:42:15    15              Then secondly, if there is going to be a vote, we need

16    time to digest this to see if maybe there's going to be a

17    consortium or if this is the best option.  That didn't happen.

18              MR. CHOSLOVSKY:  Judge, they put up their second

19    million dollars not in February of this year.  They put it up

03:42:32    20    in June through August of 2016.  Ultimately, this gets to one

21    prong of the analysis, which is -- well, I guess, two prongs,

22    inadequate remedy at law, meaning if these assets are being

23    sold for way, way too cheap, which also is another

24    misstatement.  They're not being sold for 200 to $400,000 in

03:42:55    25    the term sheet.  There's an earnout of eight times of 2018's

1    revenues.  So that's the only way their clients are potentially

2    getting paid.

3              But ultimately it comes down to inadequate remedy at

4    law.  If they want to sue TT for buying a very valuable asset

03:43:15    5    on the cheap that they couldn't find anybody else to buy, and

6    we after 400 days haven't found anybody better, they have that

7    remedy.  If they want to sue these defendants and add counts

8    for some breaches of fiduciary duties, they can do that.

9              But ultimately notice is not damage in and of itself.

03:43:32    10    Their damages are by definition speculative.  They have to show

11    their damages.

12              THE COURT:  And when you are seeking an injunction,

13    particularly for something that, you know, is ongoing right

14    now, if I were to say go ahead, it's fine, from September 5th

03:43:56    15    to September 14th they were denied those 11 days -- or nine

16    days, I guess, in which to find other, better buyers and

17    present that to the other stockholders.  Again, maybe they

18    won't, but we don't know until September 14th comes and goes

19    and they don't have anybody.  That is the damage.  That is the

03:44:37    20    damage.

21              MR. CHOSLOVSKY:  The potential that they can find

22    somebody.

23              THE COURT:  Yes.

24              MR. CHOSLOVSKY:  So in that regard is the suggestion

03:44:51    25    no sale until after September 14th?

1      THE COURT:  You can't vote until September 14th, and

2   then you can vote.  This is assuming that I find that August

3   25th constituted sufficient notice.  If I don't find that, it

4   would be that you could send out notice today.  You would have

03:45:23      5   20 days from today and hold the vote.  People will vote the way

6   they vote.  It will be done in accordance with the bylaws and

7   Delaware law, the result comes out, and then you sell the

8   company or you don't.

9      MR. CHOSLOVSKY:  So on the irreparable harm notion, in

03:45:46     10   terms of putting on a witness to show that they've had notice

11   for 400 days, they have been unable to --

12      THE COURT:  It's not -- you're not using notice

13   properly, right?

14      MR. CHOSLOVSKY:  Okay.  They have not found a buyer in

03:46:01     15   400 days or done anything on their own, so the suggestion of

16   damages that --

17      THE COURT:  But there are lots of -- you are

18   conflating all sorts of things.  The whole purpose of the

19   Delaware law and the bylaws is that when the directors decide

03:46:22     20   that they want to sell substantially all of the assets of the

21   company, the stockholders, first of all, have to have notice of

22   a particular sale, the terms of a particular sale, that they

23   have all the material information as to whether the directors

24   are going to get positions in the new company, whether they

03:46:51     25   would be consultants, whether they are going to be treated

1  differently than any of the other stockholders.  They're

2  entitled to all of that information in addition to the ability

3  to put together something that is a better offer than what's on

4  the table so that they can recoup as much of their investment

03:47:12  5  as possible.

6      MR. CHOSLOVSKY:  And do they have a burden to show

7  that they've tried to do anything whatsoever to try to find an

8  offer, meaning so that these damages aren't speculative?

9      THE COURT:  No, they do not.

03:47:24  10      MR. CHOSLOVSKY:  Okay.  I have nothing further, Judge.

11      MR. SWEENEY:  There's one thing, Your Honor.  I know

12  that you've got our papers and you've got defendants'.  I don't

13  believe the August 25th e-mail that counsel read from is a part

14  of those records.  The defendants in their brief said they were

03:47:49  15  maintaining that these were confidential, even though they were

16  sent out to a long list of people, so they didn't actually

17  include the actual e-mail that was read to you today.  If

18  that's the one that they're going to say is notice, we would

19  like to submit it to the Court as an exhibit today so that you

03:48:09  20  have the full document.

21      THE COURT:  All right.  Do you have a copy of that

22  e-mail?

23      MR. SWEENEY:  We do.

24      THE COURT:  We can make sure that that e-mail -- well,

03:48:25  25  why don't you -- you can just put it on the docket as an

1    additional exhibit but under seal.

2         MR. SWEENEY:  Okay.

3         THE COURT:  I believe that that has confidential

4    information, financial information in it, right?

03:48:42   5         MR. CHOSLOVSKY:  Well, the confidential information

6    was that we had kept confidential who the potential buyer was,

7    but in their complaint they revealed who the potential buyer

8    was.  So that train left the station when they filed the case

9    in terms of who Trading Technologies is.

03:49:00   10        I guess since this is about 20 days, the question is:

11   Does the clock start?  I guess we need a ruling on whether the

12   clock starts on August 25th when the offer -- when this e-mail

13   was sent to all shareholders and attached to it was a copy of

14   the term sheet from TT, or whether the clock hasn't started

03:49:31   15   starting ticking yet, so send a new notice and get it right and

16   see if TT sticks around.

17        THE COURT:  So why don't I take a look at the e-mail.

18        MR. CHOSLOVSKY:  (Handing document to the Court.)

19        THE COURT:  Thank you.

03:49:49   20        MR. CHOSLOVSKY:  While you're studying that, Judge, if

21   you want, counsel can huddle between us for a moment.

22        THE COURT:  Sure.

23        MR. CHOSLOVSKY:  Thank you.

24      (Recess.)

03:57:31   25        THE COURT:  Yes?

1          MR. CHOSLOVSKY:  We came to no agreements of any sort,
2     Judge.
3          THE COURT:  Okay.  So I take it that it's plaintiff's
4     position that this August 25th e-mail does not constitute
03:57:50    5     proper notice.
6          MS. SCHARKEY:  Correct.
7          THE COURT:  I agree.  Under the bylaws, there should
8     be written notice that states the place, the means of remote
9     communication by which stockholders and proxy holders may be
03:58:14   10     deemed to be present in person and vote, the date and time of
11     the meeting, the purpose for which the meeting is called.  Then
12     under Delaware law there's also requirements, additional
13     requirements for the record date for determining the
14     stockholders entitled to vote at the meeting.
03:58:49   15          So this e-mail, I think, complies with some of the
16     requirements.  It certainly gives the purpose of the meeting.
17     I think there's an issue with the polling, that that is
18     ambiguous and doesn't give sufficient information as to who is
19     allowed to vote, how they're going to vote, and the time and
03:59:38   20     place at which they're going to vote.  So I will give you this
21     back.
22          MR. NEVILLE:  Thank you.
23          THE COURT:  So obviously by this point defendants know
24     what's required by the notice, and they can send out the notice
04:00:04   25     today.  If they send it out today, then 20 days from today

1    would be the 27th of September, which would be the date of the

2    vote, and then you can go from there.  So I am going to grant

3    the TRO in part.  I find at least as to the notice claim that

4    plaintiffs have a likelihood of success on the merits.

04:01:17    5    With regard to jurisdiction, I find that jurisdiction

6    is proper.  I have jurisdiction, diversity jurisdiction over

7    the Delaware state law claims, because the defendants reside in

8    Illinois and Overwell is a foreign company with a foreign place

9    of business and alleges damages that exceed the threshold

04:01:38    10    amount.  Personal jurisdiction is proper because defendants

11    reside in Illinois and are alleged to have acted in Illinois as

12    it relates to the claims.

13    With regard to the sale terms and any other employment

14    or consulting agreements, the plaintiffs have the term sheet

04:02:16    15    because that was attached to the August 25th e-mail, is that

16    right?

17    MR. SWEENEY:  We do.

18    THE COURT:  Okay.

19    MR. SWEENEY:  It was actually -- not to get into the

04:02:27    20    weeds, but that was actually rejected.

21    THE COURT:  Right.

22    MR. SWEENEY:  And the new one came out on September

23    1st.

24    THE COURT:  Right.

04:02:33    25    MR. SWEENEY:  So we do have that.

1    THE COURT:  Okay.  That one is substantially similar

2  but was removing the term that Overwell agree.

3    MR. SWEENEY:  Correct.

4    THE COURT:  Okay.  Otherwise, do you have any other --

04:02:53    5  or do you believe that you're missing any other material

6  information for the voting stockholders?

7    MR. SWEENEY:  I think absolutely probably the most

8  critical piece of information that needs to be provided,

9  counsel referenced it.  It's not just $350,000, but the deal

04:03:11   10  with TT provides for a fourth quarter revenue tail where you

11  get four times IBIDTA, and then for 2018 you get eight times

12  IBIDTA.  Nobody knows what that is.  Nobody knows what the

13  company has projected those numbers to be.

14    So while Mr. Widerhorn comes out and says that could

04:03:37   15  be $16 million if we have $2 million of IBIDTA next year, well,

16  what are the odds we're going to have $2 million of IBIDTA next

17  year?  Have you done some sort of projection analysis with

18  regard to that?  That apparently is the largest component of

19  this deal according to him.

04:03:57   20    Now, if he comes in and says that number is really

21  zero, that we're not going to have revenue in the fourth

22  quarter because we're not going to have anybody, that 2018 is

23  going to be a development year because all of our key personnel

24  are fixing this algorithm to would make it work, well, then

04:04:17   25  someone who comes in and offers them 500 grand flat would be

1    giving them a better deal than someone who offers them 350 with

2    a chance at zero.  So how the company has decided that that's

3    actually going to make the shareholders money is a critical

4    fact which we don't have.

5            MS. CHOSLOVSKY:  So, Judge, I don't think this is too

6    helpful for you given your ruling, but the short answer is that

7    when new notice goes out, assuming new notice will go out,

8    meaning if it's futile, it's futile, meaning if TT says forget

9    it, then forget it.  But if as I hope your premise is correct

10   that they've been around and they're going to stick around

11   because they see some value here, if you're right and we

12   renotice, what they're saying in a nice way is:  We want more

13   information.

14           We've given all the financial results there are of the

15   company.  That's why I have a binder of potential exhibits

16   showing what they've received by e-mail.  But if they don't

17   think it's sufficient, they'll be back before you.  But the

18   notion of what will those generate, they will generate zero

19   unless the only buyer, TT, sticks around because there is no

20   company anymore.  There's no more company.

21           THE COURT:  But what they're saying is that obviously

22   somebody did some analysis at some point along the way to value

23   what this revenue stream is, right?

24           MR. SWEENEY:  Right.

25           THE COURT:  So what they are asking for is that

04:04:31

04:04:55

04:05:06

04:05:23

04:05:48

1   analysis so that they can say:  This is completely unfounded

2   and ridiculous, so let's hustle up and go out and find somebody

3   to come up with a better deal, or this is worth more than I

4   thought.

04:06:16   5   MR. CHOSLOVSKY:  I couldn't agree more.

6   THE COURT:  This is great.

7   MR. CHOSLOVSKY:  If there's an analysis, we will

8   happily provide it.  The question of is it four times zero for

9   the fourth quarter of this year, and for next year's revenue is

04:06:30   10   it eight times zero or is it eight times some other number, if

11   there's an analysis there's no reason for us not to share that

12   analysis.  We will be happy to share that analysis.

13   But what I'm trying to impart is that A, I don't think

14   there is an analysis and, B, every single day, if there was an

04:06:48   15   analysis three months ago, it's probably meaningless today

16   because there is no company.

17   THE COURT:  Well, your client is here, right?

18   MR. CHOSLOVSKY:  The client is here, yes.

19   THE COURT:  Okay.  Just ask him.  He would know.  Just

04:07:00   20   ask him.  Has an analysis been done?

21   MR. CHOSLOVSKY:  I don't believe so.  We will find

22   out.

23   THE COURT:  Go ahead and ask him.

24   MR. CHOSLOVSKY:  We'll find him.  I think he's across

04:07:10   25   the street.  Give me a moment, Judge.

1    (Discussion off the record.)

2         THE COURT:  All right.  So other than that analysis,

3    is there anything else that plaintiff needs?

4         MR. SWEENEY:  That is the critical element.

5         THE COURT:  All right.  Then we'll have taken care of

6    that as soon as you hear from your client and we find it out.

7    Okay.  So otherwise that claim, once we establish this issue,

8    would be moot, right?

9         MR. SWEENEY:  So what happened was we were told on

10   August 16th that the numbers were being restated by the

11   accounting and legal teams that Mr. Widerhorn had hired.  A

12   subsequent e-mail from a shareholder asked who were the

13   accounting firms and who were the law firms.  He said:  Well,

14   actually I just called my guy who prepares my tax returns and

15   asked him questions.  I did the accounting.

16        So I think we got that, what he did.  So assuming

17   that's all there was, it sounded like there was something much

18   more significant on August 16th when he said that all the

19   financial statements for the company had been restated back to

20   inception.  So people thought:  What does that mean?  Can we

21   see the old ones?  Can we see the new ones?  Can we see the

22   report from the accounting firm as to what changes were made

23   and why they were made?

24        Then it turned out he did them.

25        THE COURT:  Okay.

1        MR. SWEENEY:  So that's a long way of saying we did

2    get what he did.

3        THE COURT:  All right.  So then there's nothing out

4    there outstanding on that.  In terms of the financial health of

04:09:25    5    Neurensic, based on that, you've gotten what there is.

6        MR. SWEENEY:  Yes.

7        THE COURT:  All right.  So that's moot.  Okay.  So

8    that takes care of likelihood of success.  Then with regard to

9    irreparable harm and adequate legal remedy, if the sale were to

04:09:49   10    go forward on a vote that violated Delaware law for a duly

11    noticed vote, I find that that would cause irreparable harm for

12    the reasons that I have stated previously and that there is an

13    inadequate remedy at law because the plaintiffs would not be

14    able to put together a better deal and not have the

04:10:21   15    opportunities to recoup their investments.

16        Additionally, if the assets are sold while Neurensic

17    is in dire financial straits and that sale then is later voided

18    because it was improperly conducted, then there would not be a

19    company for the assets to return later, and that again would

04:10:58   20    cause irreparable harm.

21        I finally find that the balance of harms weighs

22    against the sale of the assets to Trading Technologies, that

23    Delaware courts enjoin the sale of substantially all assets of

24    a corporation when there's no vote called on at least 20 days'

04:11:29   25    notice.  Overwell faces irreparable harm if the sale is to go

1   forward because it's deprived of its right as stockholders to

2   vote on a sale of substantially all of the corporate assets.

3   Widerhorn -- well, both defendants will suffer less irreparable

4   harm from any temporary delay from an order declaring that

04:12:16   5   Neurensic's assets cannot be sold without stockholder approval.

6   The two directors say they won't be taking any perks, payment,

7   or employment from Trading Technologies, so they won't lose any

8   planned next employment or consultant positions with Trading

9   Technologies.

04:12:38   10       I don't believe that defendants have presented

11   sufficient evidence showing that the balance of harms weighs in

12   their favor and against plaintiff.  As I said before, if the

13   notice is improper, that's a sufficient basis on which to void

14   the sale.  Trading Technologies has been around and negotiating

04:13:07   15   with Neurensic since May.  Any extension beyond September 8th

16   or September 13th is not going to substantially harm either

17   Trading Technologies or substantially devalue Neurensic, and I

18   find that the balance of harms, while not hit out of the park

19   in favor of the plaintiff, does favor a TRO.

04:13:49   20       In terms of the public interest, stopping an abuse of

21   Delaware law preserves the rule of law and preserves the rights

22   of the stockholders in Neurensic.  So considering all of the

23   factors, a narrowly tailored temporary restraining order that

24   declares that the two directors cannot pursue the sale of

04:14:14   25   assets to Trading Technologies without a properly noticed vote

1  by voting stockholders is justified.

2      In terms of a bond, Overwell asserts that it should

3  not pay a bond because of the preferred stockholder agreement.

4  However, the preferred stockholder agreement only applies to a

04:14:40  5  breach or threatened breach by each party to the agreement of

6  any of its obligations under the stockholder agreement.

7  Because Overwell alleges breaches and threatened breaches of

8  the bylaws and Delaware law and not breaches of the preferred

9  stockholder agreement, Overwell presents no reason to excuse a

04:15:00  10  bond.  The appropriate bond should capture the diminution in

11  value of the delay of the sale of Neurensic's assets, so the

12  bond should cover any diminution caused by a 14-to-28-day delay

13  in finalizing and approving the deal.

14      All right.  Is there anything else we need to take up?

04:15:27  15      MR. CHOSLOVSKY:  The only thing I can think of, we

16  enjoy a good relationship with counsel.  So we will discuss

17  this last factor of the bond, and I would hope we could reach

18  some sort of agreement.  If we can't, we'll bring something

19  before you.  Otherwise, this is going to sound cheesy, but we

04:15:47  20  appreciate your insight, and if TT sticks around we will

21  renotice.

22      THE COURT:  Okay.

23      MR. SWEENEY:  Was there a response for the analysis?

24      MR. NEVILLE:  Oh, yes.  An analysis was provided I

04:15:57  25  think yesterday or a couple days ago for 2017 and '18.

1    THE COURT:  Okay.

2    MR. CHOSLOVSKY:  So something was sent by e-mail, but

3 let me be very clear.  If there's any other analysis that has

4 been done, there's no reason not to share it.  We believe it's

04:16:12  5 already been provided.  To make this real, Judge, and not

6 academic, our client hasn't received a paycheck in over a year.

7 There are no -- I shouldn't say no employees left.  There's

8 four or less employees left who have been working for free, so

9 to speak, so we can't make anything which doesn't exist.  But

04:16:34  10 any analysis that's been done will be provided.  There's no

11 reason not to.

12    THE COURT:  That's all we're asking for.

13    MR. CHOSLOVSKY:  If they can find an offer in these 20

14 days, wow, we'll be the happiest people there.

04:16:48  15    THE COURT:  Well, that's the thing.  You know, I

16 understand that defendants think this was an exercise in

17 futility, and being a very pragmatic person myself, I

18 understand the argument that in 20 days you can be right back

19 where you are at best, where Trading Technologies is still

04:17:14  20 willing to do the deal for the same amount of money.  Maybe

21 everybody in the end will get their investment back through the

22 revenue trail this year and next year, and that would be great,

23 right?  It could also be at the end of 20 days that Trading

24 Technologies is not interested and there are no other buyers

04:17:41  25 and the company goes into bankruptcy and everybody loses.  I

1  understand that, too.  Obviously, that's not where anybody
2  wants this to end.

3        However, we have rules and procedures for a reason,
4  and I can't go around saying that it doesn't apply because
04:18:11  5  there are somehow these extenuating circumstances that are of
6  the defendants' own creation.  I can't do that.  So hopefully
7  it all works out.  If Trading Technologies, you know, has been
8  interested since May, I think a couple of weeks is not going to
9  make that much more of a difference, and we'll see what
04:18:40  10  happens.

11        So why don't you get together and do a proposed order
12  for the TRO, send it back to each other and then send it to me
13  in my proposed order e-mail box, and then I'll get it entered.
14  Okay?

04:18:55  15        MR. SWEENEY:  Thank you.
16        MS. SCHARKEY:  Thank you, Your Honor.
17        MR. CHOSLOVSKY:  Thank you, Judge.
18        THE COURT:  You're welcome.
19     (Proceedings concluded.)
20             C E R T I F I C A T E
21       I, Patrick J. Mullen, do hereby certify that the
foregoing is a complete, true, and accurate transcript of the
22  proceedings had in the above-entitled case before the Honorable
SARA L. ELLIS, one of the judges of said Court, at Chicago,
23  Illinois, on September 7, 2017.

24                    */s/ Patrick J. Mullen*
                  Official Court Reporter
25                    United States District Court
                  Northern District of Illinois