UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OVERWELL HARVEST LIMITED, a British Virgin Islands company, individually and derivatively on behalf of Neurensic, Inc. | ) ) ) ) | |
| Plaintiff, | ) ) | No. 17 C 6086 |
| v. | ) ) | Judge Sara L. Ellis |
| DAVID WIDERHORN, PAUL GIEDRAITIS, and TRADING TECHNOLOGIES INTERNATIONAL, INC. | ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

While Trading Technologies International, Inc. ("Trading Technologies") was negotiating with Neurensic, Inc. ("Neurensic") to buy its assets, Overwell Harvest Limited ("Overwell") brought this suit individually and derivatively in its capacity as a Neurensic shareholder to ensure the sale was lawful. Overwell initially sued Neurensic's Chief Executive Officer David Widerhorn[1] and its Chief Operating Officer Paul Giedraitis.[2] Approximately nine months later, Overwell added Trading Technologies to the lawsuit, alleging it aided and abetted certain of Widerhorn and Giedraitis' breaches of fiduciary duties. Specifically, Overwell alleges that Widerhorn and Giedraitis, with Trading Technologies' aid, breached their fiduciary duties by facilitating a transfer of certain Neurensic employees and assets to Trading Technologies prior to the sale of Neurensic's assets to Trading Technologies. Trading Technologies and Overwell have now filed cross-motions for summary judgment. Because questions of material

---

[1] Widerhorn filed for bankruptcy on December 15, 2017, automatically staying the proceedings against him.

[2] On October 25, 2021 the Court approved a settlement agreement between Overwell and Giedraitis.

fact exist with respect to each element of the claim, the Court denies the parties' cross-motions for summary judgment.

## BACKGROUND[3]

Neurensic was a Delaware start-up corporation in the financial technology industry founded by Widerhorn, Giedraitis, and two others in October 2015. Overwell was formed the same year "for the sole purpose of investing in Neurensic." Doc. 198 ¶ 1. Overwell's Board of Directors consists of Kenneth Chu, Benedict Ng, and Hilton Tam. Overwell was one of Neurensic's shareholders and its largest investor, investing a total of $3.5 million. Overwell initially invested $2.5 million in Neurensic in December 2015. Shortly after, in March 2016, Widerhorn reported to Overwell that Neurensic was low on resources and needed $500,000 in "emergency funding." *Id.* ¶ 38. In July and August 2016, Overwell invested an additional $1 million in Neurensic. After this investment, Widerhorn was the only shareholder that held more Neurensic stock than Overwell. In connection with this investment, Overwell negotiated a seat on Neurensic's Board of Directors and certain preferred stock options that entitled it to the first $8 million owed to Neurensic's shareholders from any sale of Neurensic or its assets. Chu took the seat on Neurensic's Board, joining Widerhorn and Giedraitis as the Directors of Neurensic.

---

[3] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and accompanying exhibits. The Court has included in this background section only those portions of the Joint Statement of Undisputed Material Facts that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment. The Court takes all facts in the light most favorable to the non-movant for each motion. The parties filed their briefs, the Joint Statement of Undisputed Material Facts, and most exhibits under seal, also providing redacted versions. When the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014) ("[D]ocuments that affect the disposition of federal litigation are presumptively open to public view . . . unless a statute, rule, or privilege justifies confidentiality." (citation omitted)); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

Between March and August 2016, Jay Biondo, Morgan Trinkaus, Eric Eckstrand, and Evan Story, among others, began working for Neurensic. Each signed an employee agreement that required Neurensic to compensate them semi-monthly and provide them with health, vision, and dental benefits. The agreement also included an appendix that contained non-disclosure and restrictive covenant provisions. The non-disclosure provision forbade the employees from "directly or indirectly disclos[ing] or us[ing] . . . any of the Company's Confidential and Proprietary Information for [their] own purposes or for the purposes of any person or entity other than the Company." Doc. 184 ¶ 22. The restrictive covenant forbade the employees from "engag[ing] in or perform[ing] any activities that directly compete with the Business of the Company," including "working or consulting for a competitor who engages in the business of trade surveillance, financial compliance data visualization, case management, market impact analysis and/or regulatory compliance software." *Id.* ¶ 23. Trading Technologies, a private Delaware corporation, was not engaged in such business prior to acquiring Neurensic; it was in the business of "developing, marketing, and licensing trading screens for professional futures traders." Doc. 198 ¶ 2.

By October 2016, Neurensic's financial status was dire and Widerhorn indicated that without immediate funding, Neurensic would need to file for bankruptcy. Accordingly, Widerhorn understood that Neurensic's "top mandate" from Overwell was selling the company. *Id.* ¶ 42. At the time, Neurensic had seven potential acquirers. In January 2017, Biondo, Trinkaus, Eckstrand, and Story entered into Revised Employment Agreements with Neurensic that granted the employees additional Neurensic stock in exchange for a reduction in their base salaries and, for Trinkaus and Story, a waiver of their right to the back pay owed to them. The Revised Employment Agreements did not include any non-disclosure or restrictive covenants

3

and stated, "The terms and conditions described in this revised employment agreement letter (the 'Agreement'), will take effect immediately and replace any prior agreements, written or oral." Doc. 184 ¶ 26; Doc. 186 at 151. By June 2017, Neurensic was significantly behind on payroll, most of its employees had left the company, and only five potential acquirers remained, including Trading Technologies. Eckstrand and Story both resigned in June 2017. Eckstrand estimates that Neurensic owed him approximately $40,000 in back pay and indicated that at some point during his employment there, he did not receive health benefits. Story did not receive pay multiple times while employed at Neurensic and also did not receive health benefits for some amount of time.

By mid-August 2017, Neurensic was insolvent and Trading Technologies was the only remaining potential acquirer. In an August 16 email regarding Trading Technologies' due diligence of Neurensic, Widerhorn sent the contact and base salary information for Biondo, Trinkaus, and three other Neurensic employees to Trading Technologies. In return, Trading Technologies' Chief Legal Officer, Mike Ryan, requested copies of Neurensic's employment agreements with the five employees. Widerhorn replied, "We will need to dig these from our prior attorney team, please give a day or two." Doc. 195 at 2. Shortly after, Trading Technologies' Chief Financial Officer at the time, Michael Kraines, asked Trading Technologies' Global Head of Human Resources to tell the five employees that "we plan to make permanent offers of employment to all" and informed her that these employees "may prove to be our best form of leverage here in terms of landing Neurensic." Doc. 194 at 2.

On August 18, in an email to Neurensic's shareholders, Widerhorn stated, "I want to re-iterate one clear point: if the investors (or a group of investors) would like to purchase the company for a fair price that satisfies emergency liens ($1.5 million or greater), we will have

4

fiduciary obligation to move forward with this offer and transfer full ownership of the business." Doc. 184 ¶ 48. Widerhorn informed them that Neurensic would need a letter of intent by August 21 to "stop the [Trading Technologies] process." *Id.* On August 22, Overwell filed this lawsuit against Widerhorn and Giedraitis and an application for a temporary restraining order ("TRO") to stop the sale. On August 24, the Court ordered Widerhorn and Giedraitis not to sell Neurensic's assets in the next fourteen days. The next day, Trading Technologies submitted a term sheet to Neurensic that stated it would offer the five previously discussed Neurensic employees consulting agreements, which the employees must accept to close the deal. At the same time, Story began discussing potential employment opportunities with Trading Technologies, noting that there were "Neurensic topics [he is] not at liberty to discuss," that he "wouldn't discuss them regardless of negotiation state," and that his "non-compete doesn't mention [Trading Technologies]." Doc. 195 at 11.

A few days later, on August 28, Trading Technologies' Chief Technology Officer at the time, Drew Shields, told Kraines that Trading Technologies "will add surveillance" regardless of whether the deal with Neurensic "falls through" and it "will likely do it with a handful of ex-neurensic employees." Doc. 184 ¶ 83; Doc. 193 at 13. Shields added, "Basically, we will take on the op-ex we'd add if we bought them but without buying them." Doc. 184 ¶ 83. The next day, in an email to Kraines and Trading Technologies' Global Head of Human Resources, Shields said, "The three technical staff we are getting are not the people Jay [Biondo] said could recreate the business for us and for the most part are just good maintainers. The real data science power was a guy named Evan [Story] who I'm meeting Thur for coffee and the engineering horsepower that stitched all together from UI to back end was a guy named Erick [Eckstrand] I

met yesterday. . . . Based on Jay's feedback, we need these two, not the three guys we're getting in the deal." *Id.*

On August 31, Widerhorn asked Ng if Overwell was "proposing an acquisition deal or investment deal of ANY kind as an alternative to the proposed [Trading Technologies] transaction." *Id.* ¶ 53. Overwell did not respond. Biondo resigned from Neurensic on September 1 after not receiving any wages in 2017, and the same day, he received an employment offer from Trading Technologies. Biondo began working at Trading Technologies on September 5. Trinkaus resigned from Neurensic between September 4 and 7 after not receiving any wages in 2017 and not receiving health benefits. On September 7, the Court held an evidentiary hearing regarding Overwell's TRO and ordered that Widerhorn and Giedraitis "take no action with respect to the sale of [Neurensic's] assets unless and until the Board satisfies all applicable requirements of Delaware law and the Bylaws of Neurensic." Doc. 19. Widerhorn's counsel informed Trading Technologies of the Court's order the same day.

On September 11, Neurensic and Trading Technologies signed a final term sheet for the sale of Neurensic's assets to Trading Technologies for $300,000. The terms also included true-up and earnout provisions, which provided Neurensic's shareholders the potential for additional value. The terms were non-binding and included that Biondo would perform client services for Neurensic from September 11 until the closing of the deal. Widerhorn stated that Trading Technologies included this arrangement so that Neurensic "could use [Biondo] until the deal closes so the other customer relationships don't fall apart." Doc. 186 at 147. Additionally, the term sheet provided that Trading Technologies would offer five Neurensic employees consulting agreements. Chu, as a Director of Neurensic, was aware of these terms. *Id.* at 146. Neurensic and Trading Technologies also entered into an Exclusivity Agreement in connection with the

proposed sale that indicated the parties would continue discussing the deal on an exclusive basis but that Neurensic could accept an unsolicited offer. The next day, Widerhorn facilitated Biondo's ability to install Neurensic software and use his Neurensic email address while working at Trading Technologies.

On September 14, a majority of Neurensic's Board (Widerhorn and Giedraitis) voted to approve the sale of Neurensic to Trading Technologies, with Chu voting against it. At the meeting, Chu asked whether Widerhorn had reminded the five employees referred to in the term sheet "that there is IP and confidential information from Neurensic and they owe an obligation as previous employees? What has been done from that perspective in terms of protecting our IP?" *Id.* at 147. Widerhorn responded, "Yes of course. All of the employees signed an Employment Agreement which contains a very long section over several pages called 'Restrictive Covenants.' In this agreement, one of the restrictive covenants is non-disclosure, and another one is non-competition. . . . From the date that they sign there are multiple levels of legal protection and it is made clear that employees cannot talk about any confidential company information outside of Neurensic. Once they resign we immediately terminate access to email and all Neurensic data." *Id.* Widerhorn added that Neurensic "store[s] confidential data from customers on our own servers" so many customers "require [Neurensic] to put strong security measures in place." *Id.* 147–48.

Chu then asked if Neurensic planned to take legal action against the employee already working at Trading Technologies "due to violation of [his] non-compete agreements?" Doc. 184 ¶ 36. Widerhorn responded, "At the moment it is difficult to say whether [Trading Technologies] could be considered a competitor . . . we consulted with our attorneys and believe it would be difficult to pursue legal action since they are in a bit of a grey area as far as the non-

7

compete provisions in the agreement." *Id.* On September 15, as required by Neurensic's bylaws and the Court's order, Widerhorn provided notice of the sale to Neurensic's shareholders and scheduled a final shareholder vote to approve the sale on October 5, 2017.

On September 20, as described in the Trading Technologies term sheet, Biondo used Neurensic data, software, and an email address to perform work on behalf of Neurensic clients while working at Trading Technologies. Trinkaus began working at Trading Technologies on September 19 and Eckstrand began working for Trading Technologies on September 29. On September 22, a Trading Technologies employee informed Kraines that "Paul [Giedraitis] had just reiterated their sensitivities to current Neurensic employees involved in product related conversations before closing." Doc. 197 at 27. Kraines replied, "Lets [sic] discuss later but I think its [sic] completely normal to begin some transition. Also pre closing we dont hv [sic] their code or anything like that." *Id.* Two days later, Shields indicated via email that Trading Technologies' "tech/product diligence [of Neurensic] is done." *Id.* at 29.

On September 27, Giedraitis asked Ryan to "remind Morgan [Trinkaus] about the obligations of his employment agreement with Neurensic and that he is not to communicate with Neurensic customers about company business, nor discuss confidential company IP with anyone at Trading Technologies until a sale is final." Doc. 184 ¶ 87. The next day, Ryan responded, "I spoke with Morgan [Trinkaus] this morning to clarify his role as a [Trading Technologies] employee and remind him of his continuing obligations under his terminated employment agreement with Neurensic." *Id.* Ryan added, "I can also assure you that [Trading Technologies] is not interested in any transfer of Neurensic IP to [Trading Technologies] prior to the close and no such transfer has occurred." Doc. 198-4 at 32.

On October 2, 2017, Trading Technologies employees discussed going to Neurensic's storage facility to assess Neurensic's physical assets and determine "how/when to move it." Doc. 192 at 107. In the same discussion, Ryan said, "Neurensic told us today that we can take the servers to [Trading Technologies] tomorrow to set them up in an environment that is separate from [Trading Technologies]." *Id.* at 106. That same day, Giedraitis confirmed with Trading Technologies that Story would "coordinate a[n] . . . IP diligence demo" of Neurensic's main product at Trading Technologies' office the following morning. Doc. 198-4 at 77. On the night of October 3, outside counsel for Trading Technologies emailed various Trading Technologies employees, Widerhorn, Giedraitis, and Neurensic's counsel informing them of the plan for the "Pre-Closing Meeting" the next day. *Id.* at 80. The attorney said they would "need to confirm" that "[a]ll physical files, documents, hard drives, etc. should be in our possession at the time of the Pre-Closing." *Id.* A meeting agenda for the "Pre-Closing" meeting on October 4 listed as topics: "[a]ll servers previously delivered to [Trading Technologies]" and "[a]ll other physical assets (hard drives, disks, paper agreements, etc.) previously delivered to [Trading Technologies] or delivered to Foley at the meeting." *Id.* at 82.

Widerhorn sent the login credentials for several of Neurensic's service providers to Trading Technologies on October 4. The same day, Widerhorn sent Trading Technologies, for the first time, the initial employment agreements for Trinkaus, Eckstrand, and Story and indicated that he was "still searching" for Biondo's agreement. Doc. 198 ¶ 35; Doc. 198-3 at 14. At 10:23 p.m. that night, Kraines assured his team that the "non contract side [of the deal] has been carried out, e.g., major asset transfers are locked down." Doc. 197 at 38. When asked to explain what he meant by this, Kraines testified that in an asset sale, typically "there are a myriad of assets of all kinds that need to be identified, secured, and get ready for transfer of title. . . . So

there's a tremendous workload in advance of any asset acquisition to go about and -- and identify each and every asset, to -- to tag the assets, to compare. This is something that [outside counsel] would do, compare the list of assets that we understood there to be against the actual physical assets in the case of a physical asset. And in some cases, as advised and directed by counsel to segregate those assets, to make them ready for the date of closing." Doc. 186 at 85. Kraines said "it is very common for work to be done in advance of the closing date, to identify those assets, sometimes segregate those assets, to effect an orderly and legally intelligent transfer of title to those assets on the date of closing. You can't just blink and move desk chairs. It doesn't work." *Id.* at 84.

Later on the night of October 4, Overwell submitted a term sheet to purchase Neurensic's assets for $400,000. The terms were non-binding; "subject to due diligence, legal review, and further documentation;" and "required Neurensic to agree to an 'Exclusive Period'" during which Neurensic could not engage in negotiations with any other entity, including Trading Technologies. Doc. 184 ¶ 60. Prior to this, Ng testified that Overwell had not "suggested or intimated to Neurensic that [it] might be willing to buy Neurensic's assets." *Id.* ¶ 59. Ng also testified that after the Court's TRO order, Overwell conducted due diligence regarding Neurensic to determine if it would submit a bid for Neurensic's assets. Ng said that this due diligence consisted of conversations with certain Neurensic investors, former Neurensic employees, and potential investors regarding the value of Neurensic's assets. Chu and Ng testified that based on this due diligence, Overwell was prepared to bid up to $1.5 million for Neurensic's assets.

At approximately 4:20 a.m. on October 5, pursuant to their Exclusivity Agreement with Trading Technologies, Neurensic forwarded Overwell's term sheet to Trading Technologies. In response, Trading Technologies informed Neurensic that it would be willing to increase the cash

component of its offer to $400,000. Widerhorn and Giedraitis met at 8:00 a.m. that morning to discuss Overwell's bid. According to Widerhorn, Chu did not attend the meeting even though Neurensic informed him of it as a member of the Board. Doc. 191 at 20. However, Ng testified that Neurensic did not invite Overwell to the meeting. Doc. 185 at 240. At the meeting, Widerhorn and Giedraitis decided that they must accept the "completed deal which is imminent, versus a deal which is not even fleshed out yet." Doc. 191 at 20. As planned, Neurensic's shareholders met at noon to vote on the sale of Neurensic's assets to Trading Technologies. All three Overwell Board members, along with the other Neurensic shareholders, were present at the meeting. At the beginning of the meeting, Widerhorn said, "Be advised that the board has determined that the [Overwell] offer is an inferior offer to the Trading Technologies offer and is therefore not going to pursue that offer with [Overwell]. The transaction with Trading Technologies will close in the very near future and is in the best interests of the Company's shareholders and creditors. Note also that Trading Technologies has increased the purchase price payable at closing to $400,000." *Id.* at 15.

Overwell expressed concerns that Neurensic "ha[d] not reached out to the competitive bid," *id.* at 20, and in response, Widerhorn said Overwell's bid was not competitive because it was "a non-binding term sheet which does not have any of the details fleshed out" compared to Trading Technologies, which had "completed extensive diligence," *id.* at 19. After more discussion regarding the two bids, Neurensic's shareholders voted to approve the sale of Neurensic to Trading Technologies, with 1,848,677 shares voting in favor, 19,585 shares voting against, and 17,195 shares abstaining from voting. Although Overwell expressed concerns about Neurensic's failure to solicit another bid from it, at no point during the October 5 meeting did Overwell offer to increase its bid and no one "did anything to prevent [it] from increasing its

11

offer during that meeting." Doc. 184 ¶ 68. When asked why Overwell did not increase its bid during meeting, Ng testified that "the fact that [Overwell] didn't raise that or . . . was not able to raise in our opinion at the shareholder meeting, again, has no bearing on why David Widerhorn did not run the proper bidding process and . . . why there was asset transfers, IP transfers, server transfers a week, two weeks before this -- before this meeting. . . . [A]gain, that just leads us to believe this was, in fact, a fait accompli. This was already a done deal." Doc. 185 at 239.

Neurensic executed an Asset Purchase Agreement with Trading Technologies on October 6, through which it sold Neurensic's assets to Trading Technologies for $400,000 in cash with the possibility for true-up and earn-out payments. Story began working for Trading Technologies on October 9. Although Trading Technologies wanted him to start earlier, after consulting with a lawyer, Story chose to start after the sale closed because he had concerns about disclosing Neurensic's confidential information.

In March 2018, Overwell amended its complaint against Widerhorn and Giedraitis, alleging they breached many fiduciary duties to Neurensic's shareholders in connection with the sale of Neurensic's assets. In June 2018, Overwell added Trading Technologies to the lawsuit, alleging it aided and abetted Widerhorn and Giedraitis in certain breaches by facilitating the transfer of certain Neurensic employees and assets to Trading Technologies prior to the sale.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.

Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The party seeking summary judgment bears the initial burden of demonstrating that no genuine

dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed.*

*Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-

moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above

to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719

F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th

Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of*

*Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The same standard applies

when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176*

*v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering

Trading Technologies' motion for summary judgment, the Court views all evidence in the light

most favorable to Overwell, and when considering Overwell's motion for summary judgment,

the Court views all evidence in the light most favorable to Trading Technologies. *Id.*

### ANALYSIS

Overwell brings one claim against Trading Technologies: aiding and abetting a breach of

a fiduciary duty. To prove the claim, Overwell must show: (1) "the existence of a fiduciary

relationship" between Neurensic's shareholders and Widerhorn and Giedraitis (2) "a breach of

the fiduciary's [(Widerhorn and Giedraitis')] duty," (3) "knowing participation in that breach" by Trading Technologies, and (4) "damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).[4] The parties agree that the undisputed facts demonstrate that a fiduciary relationship existed between Neurensic's shareholders and Widerhorn and Giedraitis. Therefore, the Court need not address this element but will address the remaining three elements in turn.

I.    **Breach of a Fiduciary Duty**

Under Delaware law, establishing a "breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Henkel of Am., Inc. v. Bell*, 825 F. App'x 243, 254 (6th Cir. 2020). Overwell alleges that Widerhorn and Giedraitis breached their fiduciary duties by allowing Neurensic employees to work for and transfer confidential information to Trading Technologies "in violation of their employment agreements" and by allowing Trading Technologies to take possession of certain Neurensic assets and confidential information prior to the sale. Doc. 99 at 26. Trading Technologies argues that the employment agreements upon which these allegations rely were not enforceable when the transfers took place in September and October 2017 and therefore, Widerhorn and Giedraitis' failure to enforce the restrictive covenants within the agreements did not constitute a breach. Overwell asserts that the employment agreements were enforceable at the time of the transfers but argues that regardless, Widerhorn and Giedraitis' actions constituted a breach of their fiduciary duty to protect and not misuse confidential information.

---

[4] As discussed in the Court's prior opinions, Doc. 93 at 6–7; Doc. 126 at 6 n.4, it applies Delaware law to the aiding and abetting claim because it "cannot exist without the underlying allegation of breach of fiduciary duty," *Schartz v. Parish*, No. 16 C 10736, 2016 WL 7231613, at *3 (N.D. Ill. Dec. 14, 2016), and Delaware law governs the breach of fiduciary duty claims under the "internal affairs doctrine," *CDX Liquidating Tr. v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011).

Regardless of a contractual agreement to do so, "[a]n agent has a duty not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, No. 3290, 2009 WL 1387115, at *15 (Del. Ch. May 18, 2009). "This common law duty obligates an employee to protect any confidential information entrusted to him by his employer." *SEC v. Cherif*, 933 F.2d 403, 411 (7th Cir. 1991). Corporate fiduciaries are bound by "[t]hese hallmark principles of agency law." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). Therefore, "[a] breach of fiduciary duty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Id.* at 602 (citing *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 965 (Del. 1980)).

Trading Technologies relies heavily on its argument that the employment agreements of Biondo, Trinkaus, Eckstrand, and Story were not enforceable when Trading Technologies hired them and therefore, no breach occurred. However, regardless of whether the agreements were enforceable, Widerhorn and Giedraitis owed a fiduciary duty to Neurensic's shareholders to protect Neurensic's confidential information. *Beard Rsch.*, 8 A.3d at 601. Trading Technologies also repeatedly argues that Overwell's complaint limits its claim against Trading Technologies to Widerhorn and Giedraitis' failure to enforce the employee agreements of Biondo, Trinkaus, Eckstrand, and Story. However, this is not the case. Overwell's complaint alleges that Trading Technologies hired key employees, "took possession of certain of the Company's assets, including its proprietary and confidential software," Doc. 99 ¶ 95, and "allowed a Company employee to work on and solicit the Company's existing clients while working for and on behalf

15

of Trading Technologies," *id.*, all while "knowing that its conduct furthered Widerhorn and Giedraitis' breach of their fiduciary duties to the Company," *id.* ¶¶ 94, 95. As explained, Trading Technologies' alleged conduct can facilitate a breach even absent any employee agreement.

Overwell argues that no genuine dispute of material fact exists as to whether Widerhorn and Giedraitis breached their fiduciary duty to protect Neurensic's confidential information. Specifically, Overwell points to the fact that Widerhorn and Giedraitis explicitly approved of and facilitated Biondo's work for Neurensic clients using Neurensic data, software, and email while Biondo was working at Trading Technologies, *see, e.g.*, Doc. 186 at 148 (Widerhorn and Giedraitis voted to approve the Trading Technologies agreement that allowed Biondo to service Neurensic's clients with working at Trading Technologies); Doc. 184 ¶¶ 90–92, 94–95 (September 2017 emails regrading Biondo's work with Neurensic clients using Neurensic software and email and Widerhorn's facilitation of it). *See Triton Constr.*, 2009 WL 1387115, at *11–12, 15 (finding that employee breached fiduciary duties by working for competitor while also working for employer and by using confidential information "for the disloyal purpose of assisting a direct competitor").

In response, Trading Technologies submits that Neurensic granted Biondo access to its data, software, and email and allowed him to do this work for Neurensic's benefit and therefore, Widerhorn and Giedraitis allowing him to do so did not constitute a fiduciary breach. *See, e.g.*, Doc. 186 at 147 (Widerhorn asserting that Trading Technologies included Biondo's arrangement in its agreement with Neurensic so that Neurensic "could use [Biondo] until the deal closes so the other customer relationships don't fall apart"). Trading Technologies also asserts that until it acquired Neurensic's assets on October 6, 2017, it was not a competitor of Neurensic and

16

therefore, Biondo did not misuse Neurensic's confidential information.  While the record

suggests that Trading Technologies was not a competitor of Neurensic in 2017, *see, e.g.*, Doc.

184 ¶ 36 (Widerhorn asserting on September 14, 2017 that "it is difficult to say whether [Trading

Technologies] could be considered a competitor"), it also suggests the opposite, *see, e.g.*, *id.* ¶ 83

(August 28, 2017 email in which Shields asserts that Trading Technologies "will add

surveillance" regardless of whether they acquire Neurensic's assets and will "likely do it with a

handful of ex-neurensic employees").  Therefore, a genuine issue of material fact exists as to

whether Biondo's access to and use of Neurensic data, software, and email to work with

Neurensic employees while employed by Trading Technologies constituted a misuse of

Neurensic's confidential information of which Widerhorn and Giedraitis approved.  *See, e.g.*, *Act*

*II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1083 (N.D. Ill. 2018) (finding genuine issue of

material fact existed as to whether agent breached her duties because the parties told "striking

[sic] different stories about whether [agent's] work during [her employer's] winding down

process was for the benefit of [her employer] or [competitor]").

Overwell also submits that Widerhorn and Giedraitis breached their duties by facilitating

the transfer of Neurensic's servers containing confidential information to Trading Technologies,

coordinating a demonstration of Neurensic's main product at Trading Technologies' office, and

providing Trading Technologies with the login credentials for several of Neurensic's service

providers prior to the sale.  *See Dweck v. Nasser*, C.A. No. 1353, 2012 WL 161590, at *17 (Del.

Ch. Jan. 18, 2012) (finding that officers breached their fiduciary duties by "directing [company]

employees to transfer [the company's] expected orders and customer accounts to [competitor],

taking [company's] property and files, and arranging a mass employee departure"); *Beard Rsch.*,

8 A.3d at 603 (finding that officer breached fiduciary duty by disclosing confidential information

to a competitor in a presentation and taking "a large amount of other confidential information" with him when he went to work for the competitor including "slide presentations, a customer list, proposal templates, analytical and pricing information, a bottle of a key chemical compound, and computer disks"). Trading Technologies argues that the record does not sufficiently demonstrate that Trading Technologies possessed the servers or that Trading Technologies used any of Neurensic's confidential information prior to the closing. However, the record allows for a reasonable inference that these things occurred, *see, e.g.*, Doc. 198-4 at 77 (October 2, 2017 email confirming that Story would "coordinate a[n] . . . IP diligence demo" of Neurensic's main product at Trading Technologies' office the following morning); *id.* at 80 (meeting agenda for October 4, 2017 "Pre-Closing Meeting" including the following topics: "[a]ll servers previously delivered to [Trading Technologies]" and "[a]ll other physical assets (hard drivers, disks, paper agreements, etc.) previously delivered to [Trading Technologies] or delivered to Foley at the meeting"); Doc. 184 ¶ 110 (October 4, 2017 email from Widerhorn to Trading Technologies containing login credentials for certain Neurensic service providers), which is sufficient for Overwell to survive a motion for summary judgment, *see Wehrle*, 719 F.3d at 842 (stating that the Court must "construe all facts in the light most favorable to the nonmovant . . . and draw all reasonable inferences in that party's favor"). Therefore, a question of fact also exists as to whether Widerhorn and Giedraitis breached their duties by facilitating the transfer of certain Neurensic assets and confidential information to Trading Technologies prior to the sale.

Last, Overwell asserts that Widerhorn and Giedraitis allowed Trading Technologies to hire Trinkaus and Eckstrand, who brought confidential information with them, prior to the sale. Trading Technologies makes similar arguments—that the record does not demonstrate that these employees used Neurensic's confidential information prior to the closing, *see, e.g.*, Doc. 198-4 at

18

32 (September 27, 2017 email from Ryan to Giedraitis in which Ryan states, "I spoke with Morgan [Trinkaus] this morning to clarify his role as a [Trading Technologies] employee . . . I can also assure you that [Trading Technologies] is not interested in any transfer of Neurensic IP to [Trading Technologies] prior to the close and no such transfer has occurred."), and therefore, no breach occurred. *See, e.g.*, *Kuryakyn Holdings, LLC v. Circo, LLC*, 242 F. Supp. 3d 789, 801 (W.D. Wis. 2017) (finding fiduciary did not breach duty simply by taking employer's confidential information because employer "adduce[d] no evidence that [fiduciary], his wife, or his son used or benefited from that specific information").

However, to constitute a breach, "there is no requirement that an agent's use of the principal's confidential information reveal that information." *Triton Constr.*, 2009 WL 1387115, at *15. In other words, one can utilize confidential information in their work without explicitly sharing it with others. *See id.* (finding that employee breached fiduciary duties by using confidential information in preparing overlapping bids for two companies and stating that "even if [employee] never explicitly revealed [company's] confidential information . . . it is more likely than not that he used that information for the disloyal purpose of assisting a direct competitor"). Therefore, a reasonable juror could infer from the record that Trinkaus and Eckstrand used Neurensic's confidential information for Trading Technologies' purposes prior to the closing simply because they were working at Trading Technologies, a competitor. *See, e.g.*, Doc. 184 ¶ 83 (internal Trading Technologies emails on August 28 and 29, 2017 from Shields stating that Trading Technologies would "add surveillance" regardless of the outcome of the Neurensic deal, that it "will likely do it with a handful of ex-neurensic employees," and that they needed Eckstrand to "recreate the [Neurensic] business" at Trading Technologies); Doc. 197 at 27 (in response to Giedraitis' concerns regarding former Neurensic employees being "involved in

product related conversations before closing," Kraines said "its [sic] completely normal to begin some transition . . . pre closing we don't hv [sic] their code or anything like that").

The parties' arguments demonstrate that a genuine issue of material fact exists as to whether Widerhorn and Giedraitis breached their fiduciary duties to Neurensic's shareholders by allowing Trading Technologies to hire Neurensic's employees and take possession of certain Neurensic assets and confidential information prior to the sale of Neurensic's assets to Trading Technologies. *See Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 231 (S.D.N.Y. 2013) (finding a "dispute of material fact as to the extent to which information [employee] sent to herself from her [employer's] account . . . was intended for use in direct competition with [employer's business], thus constituting a breach of [employee's] duty of loyalty"); *cf. SMC Networks Inc. v. Hitron Techs. Inc.*, No. SACV 12-1293, 2013 WL 12114079, at \*9 (C.D. Cal. Nov. 13, 2013) (finding genuine issue of material fact existed as to whether former officer breached fiduciary duty by soliciting key employees to join competitor where record suggested both that the officer recruited employee and that employee left for other reasons).

Finally, Trading Technologies argues that the business judgment rule protects Widerhorn and Giedraitis' decisions because Overwell has failed to show that the presumption does not apply. "The business judgment rule is a presumption that in making a business decision . . . the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Lowinger v. Oberhelman*, 924 F.3d 360, 366 (7th Cir. 2019) (alteration in original) (citation omitted). Overwell may rebut the presumption by "raising a reason to doubt" whether Widerhorn and Giedraitis acted in good faith when allowing the transfers of certain Neurensic employees, confidential information, and assets to Trading Technologies prior to the sale. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275,

286 (Del. Ch. 2003). A director acts in bad faith where "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *In re Comverge, Inc.*, C.A. No. 7368, 2014 WL 6686570, at *13 (Del. Ch. Nov. 25, 2014) (citation omitted). Here, a juror could conclude that Widerhorn and Giedraitis acted with a purpose other than advancing the best interests of Neurensic by allowing the pre-sale transfers. *See Beard Rsch.*, 8 A.3d at 601–02 (explaining that misusing confidential information is one way a fiduciary can "plac[e] himself in a position antagonistic to his principal"). Therefore, whether the business judgment rule protects Widerhorn and Giedraitis' decisions is another question for the trier of fact. *See Expansion Cap. Grp., LLC v. Patterson*, 514 F. Supp. 3d 1095, 1115 (D.S.D. 2021) (denying motion for summary judgment and rejecting business judgment rule defense where there was a genuine dispute of material fact regarding claim that former officer used confidential information); *cf. Best W. Int'l, Inc. v. Furber*, No. CV-06-1537, 2008 WL 2045701, at *6 (D. Ariz. May 12, 2008) (denying motion for summary judgment because plaintiff "presented evidence that [director] is personally interested . . . [so] the business judgment rule does not apply").

## II.     Knowing Participation

Knowing participation by a third party in a fiduciary's breach "requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Malpiede*, 780 A.2d at 1097. To prove knowledge, Overwell must demonstrate that Trading Technologies "had 'actual or constructive knowledge that [its] conduct was legally improper.'" *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (citation omitted). To prove sufficient participation, Overwell can show that Trading Technologies "participated in the [directors'] decisions, conspired with [the directors], or otherwise caused the [directors] to make

the decisions at issue." *Malpiede*, 780 A.2d at 1098.  All of Trading Technologies' arguments again revolve around the employee agreements and whether Trading Technologies knew its conduct violated the agreements.  However, as previously explained, Widerhorn and Giedraitis owed Neurensic's shareholders a fiduciary duty to protect Neurensic's confidential information irrespective of the employment agreements.

Overwell argues that the undisputed facts demonstrate that Trading Technologies knowingly participated in Widerhorn and Giedraitis' breaches.  Specifically, Overwell submits that Trading Technologies knew that the Court ordered Widerhorn and Giedraitis to "take no action with respect to the sale of [Neurensic's] assets" until after the final shareholder vote, Doc. 19, and Trading Technologies knew that taking possession of Neurensic's confidential information prior to the final vote would be unlawful, *see, e.g.*, Doc. 184 ¶ 87 (Ryan assuring Giedraitis that Trading Technologies "is not interested in any transfer of Neurensic IP to [Trading Technologies] prior to the close").  And yet, prior to the final shareholder vote, Trading Technologies caused Widerhorn and Giedraitis to transfer certain Neurensic assets containing confidential information to it and to share certain confidential information with it at a meeting. *See, e.g.*, *Beard Rsch.*, 8 A.3d at 604 (finding third party knowingly participated in breach by facilitating presentation at which officer revealed confidential information because third party "knew or should have known that [the officer] was using and disclosing to [third party] confidential information of [employer] and thereby breaching his fiduciary duties to [employer]").  However, a juror could also reasonably conclude that Trading Technologies did not know its possession of certain Neurensic assets and information prior to the sale constituted a breach. *See, e.g.*, Doc. 186 at 84 (Kraines asserting that in asset sales, "it is very common for work to be done in advance of the closing date" regarding the moving and segregating of assets).

Overwell also contends that Trading Technologies knew that allowing Neurensic employees to use Neurensic's confidential information while working at Trading Technologies constituted a breach of Widerhorn and Giedraitis' fiduciary duties. *See, e.g.*, Doc. 184 ¶ 87 (Ryan reminded Trinkaus "of his continuing obligations under his terminated employment agreement with Neurensic" and assured Giedraitis that Trading Technologies "is not interested in any transfer of Neurensic IP to [Trading Technologies] prior to the close"); Doc. 195 at 11 (Story informed Trading Technologies that there were "Neurensic topics [he is] not at liberty to discuss" and that he "wouldn't discuss them regardless of negotiation state"). And yet, Trading Technologies caused Widerhorn and Giedraitis to facilitate Biondo's access to Neurensic's confidential information while working at Trading Technologies and caused Widerhorn and Giedraitis to acquiesce to Trading Technologies' hiring of Trinkaus and Eckstrand prior to the sale. *See, e.g.*, *Triton Constr.*, 2009 WL 1387115, at *16 (finding third party knowingly participated in breach by hiring employee because it knew the employee worked for a competitor and deliberately concealed the hiring from the competitor, indicating scienter).

However, the record also contains evidence from which a juror could reasonably infer that Trading Technologies did not allow Neurensic employees to use Neurensic's confidential information prior to the sale and did not know that such conduct constituted a breach. *See, e.g.*, Doc. 197 at 27 (in response to Giedraitis' concerns regarding former Neurensic employees being "involved in product related conversations before closing," Kraines said "its [sic] completely normal to begin some transition . . . pre closing we don't hv [sic] their code or anything like that"); Doc. 184 ¶ 87 (Ryan assured Giedraitis that Trading Technologies "is not interested in any transfer of Neurensic IP to [Trading Technologies] prior to the close and no such transfer has

occurred"). Therefore, a genuine issue of material fact exists regarding whether Trading Technologies knowingly participated in Widerhorn and Giedraitis' breaches.

## III.    Causation and Damages

"[U]nlike a claim for breach of fiduciary duty, a claim for aiding and abetting a breach of fiduciary duty under Delaware law . . . require[s] damages and proximate causation as elements of the claim." *Henkel*, 825 F. App'x at 260. A proximate cause is one that "produces the injury and without which the result would not have occurred." *RBC Cap. Mkts.*, 129 A.3d at 864. To establish proximate cause, Overwell "must show that the result would not have occurred 'but for' [Trading Technologies'] action[s]," *id.* (citation omitted), or in other words, that the "damages to [Overwell] resulted from the concerted action of [Widerhorn and Giedraitis] and [Trading Technologies]," *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002). Overwell alleges that Widerhorn and Giedraitis' breaches "denied [Neurensic and its shareholders of] a more valuable and financially superior opportunity than that which was offered by Trading Technologies." Doc. 99 ¶ 98. Trading Technologies argues that no reasonable juror could conclude that the transfer of Neurensic's employees and assets to Trading Technologies prior to the sale deprived Neurensic of a higher bid because the record does not suggest that a potential acquirer refrained from bidding more *because of* the transfers. However, Overwell submits that it would have bid up to $1.5 million for Neurensic's assets but did not because the transfers made it so that no "other bidder had any legitimate chance of acquiring Neurensic's assets." Doc. 213 at 16l.

During the October 5, 2017 shareholder meeting, although Overwell raised concerns regarding Neurensic's failure to solicit another bid from Overwell, it never raised concerns regarding the transfers or suggested that it would have bid more but for the transfers. *See* Doc.

191 at 15–25. However, when asked why Overwell did not submit a higher bid at the meeting, Ng testified that it seemed as though the sale to Trading Technologies was "*a fait accompli*" and "already a done deal" in part because "there was asset transfers, IP transfers, server transfers" completed before the meeting. Doc. 185 at 239. Therefore, a reasonable juror could conclude either that Widerhorn and Giedraitis' breaches proximately caused Overwell to refrain from increasing its bid or that they did not. *See, e.g.*, *RBC Cap. Mkts.*, 129 A.3d at 865–66 (upholding aiding and abetting judgment against financial advisor where evidence supported that *but for* the advisor's actions in misleading the Board, the Board would have chosen a higher bid and the shareholders would have received more value for the company); *Morgan v. Cash*, C.A. No. 5053, 2010 WL 2803746, at *5 (Del. Ch. July 16, 2010) (noting, in dismissing aiding and abetting a breach of a fiduciary duty claim, that even if the breach occurred, "there is no reason . . . to believe that it mattered in a material way"). As a result, a genuine issue of material fact exists as to whether Widerhorn and Giedraitis' breaches proximately caused damages to Neurensic's shareholders. *See, e.g.*, *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 373 (Del. Ch. 2008) (denying motion for summary judgment on aiding and abetting claim where plaintiff created a genuine issue of material fact regarding whether breach proximately caused damages by pointing to deposition testimony that called into question whether the tainted Board vote was immaterial to the merger's approval).

Last, Trading Technologies argues that no damages exist because, due to its preferred stock options, Overwell would have received the first $8 million of any proceeds to Neurensic's shareholders from the sale of its assets. So, to avoid a windfall to Overwell, the Court should offset any damage award by the amount Overwell was to receive, which would net to zero. However, as the Court previously explained, "Overwell brings a derivative, not an individual

claim.  Because this is Neurensic's cause of action, damages would be awarded to the company.  As such, the proper measure of damages is the harm to the company, not the individual shareholders."  Doc. 126 at 13.  Further, "it does not matter if Overwell would have bid more than the company's liabilities in order to recoup its own investment.  It only matters that Neurensic could have extracted a more favorable sale price than it did."  *Id.* at 14.  Therefore, it does not matter that, functionally, Overwell may not receive any damage award here.  A genuine issue of material fact exists as to whether Neurensic could have received a higher sale price and therefore, as to whether damages exist.

<h1 style="text-align:center">CONCLUSION</h1>

For the foregoing reasons, the Court denies Trading Technologies' and Overwell's motions for summary judgment [181, 201].

Dated: November 1, 2021

SARA L. ELLIS
United States District Judge