IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OVERWELL HARVEST LIMITED, a British Virgin Islands company, individually and derivatively on behalf of Neurensic, Inc., <br><br> Plaintiff, <br><br> v. <br><br> DAVID WIDERHORN, PAUL GIEDRAITIS, and TRADING TECHNOLOGIES INTERNATIONAL, INC., <br><br> Defendants. | Case No. 17-cv-06086 <br><br> Honorable Sara L. Ellis |

**TRADING TECHNOLOGIES' MOTION TO
<u>PRECLUDE WINDFALL DAMAGES AND OTHER RELIEF</u>**

David J. Doyle
Dylan Smith
Kirk Watkins
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
ddoyle@freeborn.com
dsmith@freeborn.com
kwatkins@freeborn.com

*Attorneys for Defendant
Trading Technologies International, Inc.*

Defendant Trading Technologies International, Inc. respectfully moves, on the grounds set forth below, for the following pretrial rulings regarding available remedies: (i) precluding derivative plaintiff Overwell Harvest Limited ("OHL") from recovering windfall damages predicated on OHL itself paying more for Neurensic's assets than Trading Technologies did; (ii) precluding recovery of attorneys' fees; (iii) precluding recovery of punitive damages; and (iv) precluding any disgorgement remedy.

I. **The Court Should Issue a Pretrial Ruling Making Clear that OHL May Not Recover Windfall Damages**

As the Court is well aware, this case arises from the sale of substantially all of Neurensic's assets to Trading Technologies for $400,000 in cash, plus potential true-up and earn-out payments. (11/1/21 Opinion and Order, ECF No. 233, at 12.) OHL claims that, as a result of Trading Technologies' aiding and abetting breaches of fiduciary duty, Neurensic was denied "the highest value for the Company's assets." (Second Am. Compl., ECF No. 99, at 29, ¶ 98.) The only "evidence" OHL has proffered to support its claim that someone would have paid more for the assets than Trading Technologies did is the testimony of OHL's principals about its own, unexpressed intent to do so. (Joint L.R. 56.1 Stmt., ECF No. 188, at 22-23, 35-36, ¶¶ 73-74, 116.) Moreover, as the only holder of Series 1 Preferred Stock in the company, OHL is entitled to receive the first $8 million in distributions payable to stockholders in the event of a liquidation event. (*Id.* at 3, ¶ 11.)

These circumstances raise the possibility of a windfall recovery to OHL. Accepting OHL's theory of the case, the jury could award damages based on a finding that OHL would have paid more than $400,000 for Neurensic's assets absent fiduciary breaches abetted by Trading Technologies. For example, OHL has claimed in interrogatory answers that it was prepared to bid up to $1.5 million for Neurensic's assets. Assume that the jury credited this claim and was

1

permitted to award Neurensic $1.1 million in damages on that basis (*i.e.*, $1.5 million minus the $400,000 paid by Trading Technologies). Assume further (for simplicity's sake) that there remained $1 million for distribution to shareholders after satisfying any outstanding creditor claims. As the preferred shareholder, OHL would stand to receive that entire $1 million. But that would be an unjust windfall because it ignores the fact that, in the real world, OHL would have needed to pay $1.5 million to recover that $1 million.

The Court should issue a pretrial ruling making clear that OHL will not be permitted to reap any such windfall recovery predicated on a finding that OHL itself would have paid more for Neurensic's assets than Trading Technologies did. The Court previously held that, because this action is derivative, "the proper measure of damages is harm to the company," and "it does not matter that, functionally, Overwell may not receive any damage award here." (11/1/21 Opinion and Order, ECF No. 233, at 25-26.) But with trial looming, it is now an appropriate time to clarify that, as a functional matter, OHL will be precluded from recovering any damages predicated on money that it essentially would have paid itself.

There are at least three reasons why it is necessary and appropriate to issue such a ruling. First, a ruling precluding windfall profits to OHL will help ensure that, in pursuing this action, OHL fairly represents "the interests of shareholders … in enforcing *the right of the corporation*" as Rule 23.1 and Delaware law requires. Fed. R. Civ. P. 23.1 (emphasis added); *see also Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 554 (Del. Ch. 2015) ("Any recovery benefits the firm as a whole and inures to creditors and stockholders according to their priority."). It is unclear precisely what priority of distribution OHL and its counsel would assign to the various stakeholders who might be entitled to share in any recovery. That issue presumably will be explored at the upcoming hearing to approve OHL's settlement with Defendant Paul Giedraitis.

But given the obvious potential for conflict between OHL and other stakeholders, it is important to eliminate any anticipation on OHL's part that it could recover windfall profits through this litigation. Otherwise, there is a heightened danger that its litigation judgment will be exercised primarily on OHL's behalf rather than on behalf of Neurensic and other stakeholders entitled to any amounts recovered in Neurensic's name.[1]

Second, formalizing this limitation on OHL's potential recovery through a pretrial ruling will assist in crafting an appropriate verdict form. It will be necessary to have the jury specify the basis for any finding of liability and measure of damages. Should there be a finding of liability, it will be important to know, for example, whether the jury based that finding on OHL's contention that it would have paid more for Neurensic's assets.

Third, avoiding windfall recoveries to particular plaintiffs is consistent with Delaware law governing derivative actions. "Derivative litigation is born of equitable principles," *Sokolowski v. Adelson*, 2015 WL 3821349, at *3 (D. Nev. June 19, 2015), and Rule 23.1 embodies the "familiar principle that in the conduct of a derivative stockholder's action[,] the district court has inherent power in equity to determine the course of its proceedings," *Phillips v. Tobin*, 548 F.2d 408, 415 (2d Cir. 1976). While each case turns on its particular facts, a consistent principle running through the case law is that the derivative form will not blind courts to substance. *See In re Cencom Cable Income Partners, L.P.*, 2000 WL 130629, at *6 (Del. Ch. Jan. 27, 2000) ("[E]quity regards substance rather than form.") (internal quotation and citation omitted); *see also Bangor Punta*

---

[1] *See Quadrant Structured Prods.*, 115 A.3d at 554-56 (noting that there is potential for "conflicts between the interests of creditors and stockholders" in derivative litigation; that "creditor-derivative plaintiffs will be incented to pursue and accept a more certain, albeit potentially lower valued settlement, while stockholder-derivative plaintiffs will favor a riskier course"; and that "[c]ounsel representing the corporation are duty-bound to present a settlement if counsel believe it to be in the best interests of the corporation, regardless of the views of the named plaintiffs").

*Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713 (1974) (courts applying equitable rules in derivative cases "deal with the substance of the action and do not blindly adhere to the corporate form"). Courts of equity thus look beyond rigid rules and seek to accomplish "what is fair and just in a particular situation." *State of Illinois v. Heckler*, 616 F. Supp. 620, 622 (N.D. Ill. 1985). In that spirit, "[e]quity abhors a windfall." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 143 (3d Cir. 2019) (internal quotation and citation omitted).

These principles make it necessary to look beyond the derivative form and clarify that, as a matter of substance and equity, OHL may not recover damages predicated on the notion that it would have paid more for Neurensic's assets than Trading Technologies did. The parties and the Court will benefit from the Court deciding this issue now, rather than at trial.

**II.     The Court Also Should Preclude OHL from Recovering Its Attorneys' Fees Because It Will Not Create Any Benefit or Common Fund for Neurensic as a Whole**

Similarly, allowing OHL to seek its attorneys' fees if it prevails at trial would be contrary to law, and the Court should not allow it. In typical derivative actions, attorneys' fees may be recoverable under the 'common fund' or 'corporate benefit' doctrines in situations "where the plaintiff creates a fund or other benefit for the shareholders." *McGowan v. Empress Entm't, Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000). But as shown above, there is nothing typical about this case and no "common" benefit will be secured for Neurensic's shareholders. Accordingly, OHL should be precluded from recovering fees and costs.

Under the aforementioned doctrines, to show an entitlement to fees, a plaintiff either must recover "a common fund for the benefit" of others or must produce a "valuable benefit [that] is realized by the corporate enterprise or the stockholders as a group." *City of Miami Gen. Emps.' & Sanitation Emps.' Retirement Trust v. C&J Energy Servs., Inc.*, 250 A.3d 764, 770 (Del. Ch. 2018) (citation omitted). Thus, where "no common benefit has been accomplished … application of the

4

'common benefit' exception is not warranted." *Moore v. Davis*, 2011 WL 3890534, at *2 (Del. Ch. Aug. 29, 2011).

Though OHL brings derivative claims in this case in only the most technical sense, in no way can it establish that these claims confer any "common fund" or "corporate benefit" to a class of shareholders. Given its preferred status, the only conceivable shareholder that could recover in this case is OHL. Therefore, even if the Court were to let this case proceed derivatively, OHL cannot establish an exception to the American Rule that each side pay its own attorneys' fees. Moreover, it is notable that OHL has brought this case as an unsuccessful bidder on behalf of a corporation that no longer is in operation. Delaware courts generally disfavor fee awards to unsuccessful bidders on corporate assets. *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1224-25 (Del. Ch. 2001) ("although a bidder for control may be a stockholder, its stockholder status is secondary to its status as a bidder," and "it strains reason to contend that bidders need the added incentive of fee shifting").

In short, the fact that Neurensic no longer is a going concern and that any amount available for stockholder distributions will go to OHL renders OHL unable to seek recovery of its attorneys' fees and costs in this case. The Court should rule accordingly.[2]

### III. The Court Should Bar Any Punitive Damages Claims Against Trading Technologies

Likewise, OHL cannot recover punitive or exemplary damages. "Delaware's high bar for a plaintiff to recover punitive damages requires demonstration of a defendant's 'outrageous conduct,'

---

[2] There also exists a "bad faith" exception to the American Rule, but it "applies only in extraordinary cases" involving "either the commencement of an action in bad faith or bad faith conduct taken during litigation, and *not from conduct that gave rise to the underlying cause of action*." *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (emphasis added). No such bad faith allegations have been advanced, or could be advanced, against Trading Technologies in this case.

5

'an evil motive,' or 'reckless indifference.'" *Laugelle v. Bell Helicopter Textron, Inc.*, 88 A.3d 110, 125 (Del. Super. 2014) (citation omitted). "Such an award may be made only if there is an element of ill will, malice or intention to cause injury to the plaintiff." *McClain v. Faraone*, 369 A.2d 1090, 1095 (Del. Super. 1977). The facts of this case do not even come close to meeting this standard.

OHL's theory is that Widerhorn and Giedraitis divulged confidential information to Trading Technologies by allowing Trading Technologies to hire three former Neurensic employees the month before the asset sale and by allowing Trading Technologies to take physical possession of servers the week of the closing that were of so little value that, to this day, no one knows what was on them. (*See* MSJ Ex. 3, ECF No. 185, at 353:11-354:2 (OHL Director Ng ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇).) There is no hint in this case of the kind of "evidence of egregious conduct of an intentional or reckless nature" or the kind of "particularly reprehensible" conduct "motivated by malice or fraud" that is needed to submit a prayer for punitive damages to a jury. *In re Bracket Holding Corp. Litig.*, 2020 WL 764148, at *18 (Del. Super. Feb. 7, 2020). As such, the Court should bar OHL from raising the issue of punitive damages at trial, through a proposed jury instruction or otherwise.

**IV.    Disgorgement Is Not a Proper Remedy Against Trading Technologies in This Case**

Finally, the Court should preclude OHL from seeking disgorgement of profits as a remedy at trial because OHL has no evidence to present to the jury on this topic.

In an interrogatory it propounded years ago, Trading Technologies asked OHL to quantify its alleged damages, both direct and derivative, and to explain in detail how it computed those damages. (MSJ Ex. 58, ECF No. 198-4, at 16, Interrogatory No. 7.) In responding to this interrogatory, OHL claimed that it was unable to quantify any disgorgement damages because "the profits Trading Technolog[ies] has achieved as a result of its acquisition of Neurensic's assets is in the sole and exclusive possession of Trading Technologies and thus is presently unknown by

6

[OHL]. Consequently, [OHL]'s investigation continues." (*Id.*) In the years that followed, OHL never supplemented this interrogatory answer, it never mentioned disgorgement of profits as a potential remedy in dozens of court filings, and its damages expert, Dr. John Finnerty, made no attempt to quantify any "disgorgement" damages.

Nor does OHL have the tools necessary to present a disgorgement analysis to the jury, even if it were allowed to do so without having divulged such an analysis during discovery. Although Trading Technologies produced certain financial documents in response to OHL's discovery requests, those documents by themselves do not contain sufficient detail to allow one to compute the purported "profits" from Trading Technologies' acquisition and development of Neurensic's surveillance software. For example, one cost component needed to calculate Trading Technologies' profits—to the extent they even exist—is the salary expense of the employees who have worked to develop and sell TT SCORE since October 2017. Yet, no records exist to show which employees spent how many hours working on this product (as opposed to myriad other projects at the company). Moreover, particularly without expert analysis, it is impossible to disentangle the "profits" earned by Neurensic's former assets (acquired at an early, "proof-of-concept" stage of development) from the profits attributable to Trading Technologies' pre-existing assets, both tangible and intangible.

Calculating the profits attributable to certain events or actions is "typically complex and involved," and expert testimony often is "necessary to establish a [required] link." *Eaton Corp. v. Auburn Gear Inc.*, 1988 WL 273448, at *2 (N.D. Ind. July 18, 1988). Here, the only expert OHL disclosed in this case was asked to provide an opinion on "the value of the assets of Neurensic, Inc. … on October 6, 2017," *not* to calculate Trading Technologies' profits. (Finnerty Rpt. at 4, ¶ 13.) Moreover, assuming disgorgement is even a proper remedy in this case (which Trading

7

Technologies does not concede), OHL would bear the "burden of producing evidence from which the court may make at least a reasonable approximation of the defendant's improper benefit." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 866 (Del. Ch. 2022) (citation and quotations omitted). OHL has no factual basis for doing so here.

Finally, a defendant's profits are recoverable under a disgorgement theory only if the plaintiff can identify a net increase in profits "attributable to the underlying wrong." *Id.* OHL's theory in this case is *not* that Trading Technologies usurped Neurensic's corporate opportunities or unlawfully converted the company's property to its own. Rather, long before any of the complained-of conduct occurred, Neurensic had embarked on a path to sell all of its assets with the full support, participation, and approval of OHL. (*See, e.g.*, Joint L.R. 56.1 Stmt., ECF No. 188, at 11-17, ¶¶ 38-53.) OHL's complaint is not that Trading Technologies bought the assets; it's that the sales price wasn't high enough. (*See* Second Am. Compl., ECF No. 99 at 29, ¶ 98 (alleging Neurensic was "ultimately deprived of a legitimate competitive bidding process … the highest value for [its] assets and … a more valuable and financially superior opportunity than [what] was offered").) For this additional reason, OHL's attempt to seek disgorgement is misplaced.

In short, it would be unfair to allow OHL to present a disgorgement computation for the first time at trial, and OHL does not have the type of competent, admissible evidence with which to do so. Accordingly, the Court should preclude OHL from seeking disgorgement at trial.[3]

---

[3] Notably, if the Court allows OHL to seek disgorgement at trial despite OHL's lack of evidence, its aiding and abetting claim should not be presented to a jury. *See Client Funding Sols. Corp. v. Crim*, 943 F. Supp. 2d 849, 858 (N.D. Ill. 2013) ("a plaintiff seeking both legal and equitable relief for a breach of fiduciary duty claim has no right to have a jury decide that claim"); *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 2018 WL 723223, at *2 (N.D. Ill. Feb. 6, 2018) (holding that equitable claim seeking "one form of equitable relief—disgorgement—and one form of legal relief … is more equitable than legal and must be resolved by the Court"). Trading Technologies hereby reserves its right to object to and/or move to strike the jury demand in this case should OHL be allowed to seek disgorgement.

WHEREFORE, Trading Technologies respectfully requests that the Court enter an order granting the following relief: (1) precluding OHL from recovering windfall damages predicated on OHL itself paying more for Neurensic's assets than Trading Technologies did; (2) precluding recovery of attorneys' fees; (3) precluding recovery of punitive damages; and (4) precluding any disgorgement remedy.

Dated: August 12, 2022

Respectfully submitted:

/s/ David J. Doyle
David J. Doyle
Dylan Smith
Kirk Watkins
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
ddoyle@freeborn.com
dsmith@freeborn.com
kwatkins@freeborn.com

*Counsel for Defendant
Trading Technologies International, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 12, 2022, he caused a true and correct copy of the foregoing document to be filed via the Court's Electronic Case Filing (ECF) system and thereby served on counsel of record.

s/ David J. Doyle
*Counsel for Defendant Trading
Technologies International, Inc.*
