IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OVERWELL HARVEST LIMITED, a British Virgin Islands company, individually and derivatively on behalf of Neurensic, Inc., <br><br> Plaintiff, <br><br> v. <br><br> DAVID WIDERHORN, PAUL GIEDRAITIS, and TRADING TECHNOLOGIES INTERNATIONAL, INC., <br><br> Defendants. | Case No. 17-cv-06086 <br><br> Honorable Sara L. Ellis |

**TRADING TECHNOLOGIES' REPLY IN SUPPORT OF ITS
MOTION TO PRECLUDE WINDFALL DAMAGES AND OTHER RELIEF**

David J. Doyle
Dylan Smith
Kirk Watkins
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
ddoyle@freeborn.com
dsmith@freeborn.com
kwatkins@freeborn.com

*Counsel for Defendant
Trading Technologies International, Inc.*

Defendant Trading Technologies International, Inc. respectfully submits this Reply in support of its Motion to Preclude Windfall Damages and Other Relief relating to certain damages theories Plaintiff Overwell Harvest Limited ("OHL") intends to present at trial.

I.  **Trading Technologies' Motion to Preclude Windfall Damages Is Consistent with the Court's Summary Judgment Finding that OHL Might "Not Receive Any Damage Award Here"**

OHL's primary opposition to Trading Technologies' first damages argument is that it supposedly asks the Court to revisit its prior rulings. (Resp. at 1-2.) Not so. Trading Technologies is *not* asking the Court to revisit its determination at the dismissal stage that OHL's aiding and abetting claim is derivative in nature, *nor* is it asking the Court to reconsider its finding on summary judgment that OHL has articulated a triable damages theory—*i.e.,* that OHL could recover "damages [that] would be awarded to the company." (11/1/21 Opinion and Order, ECF No. 233, at 26.)

It does not follow, however, that OHL should be allowed to recover damages at trial if OHL itself would have been the *source* of those damages. According to OHL, "[i]t is of no concern to Trading Technologies how a recovery on behalf of Neurensic is to be distributed amongst its shareholders." (Resp. at 3.) But, of course, the distribution of any recovery *is* a matter within the Court's concern. (*See* Mot. at 3-4 (collecting cases demonstrating the need for courts in derivative cases to apply equitable principles).) Moreover, given the equitable nature of a derivative action, whether OHL stands to reap a windfall is not simply a ministerial manner of "distribution."

Noticeably absent from OHL's Response (or any of its filings in this case) is an explanation of how anyone other than OHL will receive any financial benefit from this litigation. The Court previously found that the suggestion that any shareholder other than OHL will recover in this case was implausible because "the numbers simply do not align." (1/31/19 Opinion and Order, ECF No. 93, at 15.) That observation was true at the time and is even truer today now that we know two

1

undisputed facts that were not apparent at the dismissal stage: (1) OHL is entitled to receive the first $8 million of any judgment before another shareholder gets a dime; and (2) OHL's own expert computed a range of values for Neurensic's assets that comes nowhere near $8 million.

That just leaves creditors. Stepping into the shoes of Neurensic, and suing derivatively on its behalf, OHL theoretically could recover damages that will be paid out to creditors of the company. Indeed, the Court must have had this possibility in mind when it wrote the final sentence of the passage OHL block quotes in its Response: "Therefore, it does not matter that, functionally, Overwell may not receive any damage award here." (Resp. at 3 (quoting 11/1/21 Opinion and Order, ECF No. 233, at 26).) Because OHL's preference puts it at the front of the line for a potential recovery, ahead of every other shareholder, the only way OHL could obtain an award for Neurensic at trial yet "functionally … not receive any damage award" is if the award is paid entirely to Neurensic's creditors. Yet, to this day, OHL has not enlightened Trading Technologies or the Court as to whether there *are* any creditors of Neurensic who stand to gain from a plaintiff's verdict at trial. Indeed, even now, OHL claims this is not Trading Technologies' "concern." (*Id.*)

But, respectfully, it is. If there are creditors of Neurensic that could recover as a result of this litigation, counsel is "duty-bound" to provide this information to the Court. *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 555 (Del. Ch. 2015). If, on the other hand, no such creditors exist, and OHL contends that it can be both the sole recipient of any damages award and the "source of the higher and more favorable bid" (Resp. at 4), the case law cited by Trading Technologies shows that this would violate sound equitable principles.

The only authority OHL cites in its Response, *Americas Mining Corp. v. Theriault*, is inapposite. (*See* Resp. at 3-4.) Oddly, OHL cites language from a post-opinion order in *Theriault* that rejected a request for reargument on "the narrow question of whether the relevant 'benefit

2

achieved' for calculating attorneys' fees in a derivative case … is properly defined as the entire judgment paid to the corporation" or a portion of that judgment where a defendant stockholder owned 81% of the corporation that was to receive the judgment. 51 A.3d 1213, 1263 (Del. 2012). That case has no bearing on the relevant question before this Court—*i.e.,* whether courts of equity should look beyond mere form and analyze the substance of the claims and the beneficiaries of any recovery to determine whether the use of a derivative action would result in a windfall.

Both Delaware courts and the United States Supreme Court have said that courts should do exactly that. *See, e.g., Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713 (1974) ("We are met with the argument, however, that since the present action is brought in the name of respondent corporations, we may not look behind the corporate entity to the true substance of the claims and the actual beneficiaries. The established law is to the contrary."). (*See also* Mot. at 3-4.) Consistent with this authority, the Court should preclude OHL from recovering any portion of a damages award at trial if the award is predicated on the notion that OHL itself would have been the source of Neurensic's damages by outbidding Trading Technologies for the company's assets.

**II.     Delaware Law Does Not Support an Award of Attorneys' Fees in This Case**

OHL's arguments for avoiding the American Rule and obtaining attorneys' fees in addition to an award of damages at trial are contrary to Delaware law and, thus, fail for several reasons.

First, OHL's reliance on the common fund doctrine is misplaced. As noted above, OHL misconstrues the holding in *Americas Mining*, which upheld an award of attorneys' fees where there were multiple shareholders who recovered from a common fund even though some of them were defendants in the case. (*See supra* at 2-3.) And one of the cases cited by *Americas Mining*— *Carlson v. Hallinan*—questioned whether the plaintiff "actually created a common fund" because "30% of the recovered money damages will go to Plaintiff" as a result of a dissolution, such that

3

"there actually will not be a surviving corporation on which to confer a benefit." 925 A.2d 506, 547 (Del. Ch. 2006). The *Carlson* Court ultimately allowed a recovery of fees, but only because the litigation "conferred a benefit on" the other defendant shareholder who would recover in dissolution. *Id.* Here, unlike the plaintiff in *Carlson*, OHL is the only shareholder that could benefit financially from a damages award at trial. Thus, the common fund doctrine does not apply.

Even if it did, however, OHL appears to assume that a plaintiff bringing a derivative action may recover both damages from a common fund *and* its attorneys' fees *on top* of those damages. (*See* Resp. at 5-7.) But, as OHL's own cases instruct, this is not the law. Rather, under the common fund doctrine, OHL would be "entitled to an allowance for fees and expenses to be paid from the fund or property which [its] efforts have created," *i.e.*, the damages it seeks in this case. *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at \*6 (Del. Ch. Aug. 30, 2007); *see also In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 362 (Del. Ch. 1999) ("in cases where plaintiffs' litigation efforts result in or contribute to the creation of a fund distributed to a class, it is generally appropriate that any fee award should be paid out of that fund"). Accordingly, even if OHL's litigation effort could be construed to create a common fund for a "class" comprised only of itself, this would not justify OHL's attempt to seek a separate award of attorneys' fees *in addition to* damages.

Further, OHL cannot recover its fees under the corporate benefit doctrine. OHL claims that it conferred a non-monetary benefit on Neurensic's shareholders by pursuing a TRO that forced the company's directors to follow Delaware law. (Resp. at 6.) The problem with this argument is that OHL obtained any such benefit from *other defendants* at a time when Trading Technologies was not a party to the case. (*Compare* Sept. 21, 2017 Order, ECF No. 19 (restraining David Widerhorn and Paul Giedraitis) *with* Am. Compl., ECF No. 60 (naming Trading Technologies as

4

a party in the litigation over nine months later).) The law requires a causal connection between the corporate benefit conferred and the litigation against *the defendant from whom fees are sought*. *See Off v. Ross*, 2009 WL 4725978, at *5 (Del. Ch. Dec. 10, 2009) (plaintiff must show that "its lawsuit caused *the defendant[]* to confer a specific and substantial benefit on the company's shareholders") (emphasis added); *Brevet Capital Special Opportunities Master Fund III, LP v. RD Legal Funding Partners, LP*, 2013 WL 12159425, at *1 (D.N.J. Oct. 24, 2013) (it is "improper for a defendant to be required to compensate a plaintiff for attorney hours devoted to the case against other defendants who settle or are found to be liable") (internal quotations and alterations omitted).

Finally, OHL cannot use the bad-faith exception to the American Rule to recover its fees. Quoting *Montgomery Cellular Holding Co. v. Dobler*, OHL claims that the bad-faith exception is a "tool to deter abusive litigation and to protect the integrity of the judicial process." (Resp. at 7.) But OHL conveniently ignores an important part of the sentence it quotes. The entire sentence reads: "The bad faith exception is applied *in 'extraordinary circumstances'* as a tool to deter abusive litigation and to protect the integrity of the judicial process." *Montgomery Cellular*, 880 A.2d 206, 227 (Del. 2005) (emphasis added) (internal citation omitted). In *Montgomery Cellular*, such "extraordinary circumstances" existed because: (1) the defendants engaged in multiple discovery abuses, including spoliation—destroying computers containing relevant information "*after* the Court of Chancery had ordered their production"; (2) a defendant's CEO lied under oath in an attempt to mislead the court; and (3) the defendants' expert valuation testimony was so "fatally flawed" in its methodology and data that the court concluded it was not presented in good faith. *Id.* at 228-29. This conduct led the appellate court to find that the defendants had "unnecessarily prolonged and increased the costs of litigation." *Id.* at 228.

5

Trading Technologies did not engage in any similar "extraordinary" conduct that justifies a bad-faith shifting of fees. Indeed, the only example of improper conduct OHL identifies, once again, is Trading Technologies' alleged participation in the supposed violation of a court order by the individual defendants *before* OHL even sued Trading Technologies in this case. If the Court bars evidence and argument relating to that order, as Trading Technologies has requested in its fourth motion in limine (*see* ECF No. 260, at 10-13), then OHL's reliance on the bad-faith exception falls away. But even if it does not, the "bad faith exception sets a high bar" for which "*subjective* culpability" must be established by "clear evidence." *Balooshi v. GVP Global Corp.*, 2022 WL 576819, at *15 (Del. Super. Feb. 25, 2022) (emphasis added). Because OHL cannot meet that high bar here, the Court should bar any attempt by OHL to recover its attorneys' fees at trial.

**III.   OHL Cannot Identify Any Evidence of "Outrageous Conduct, Evil Motive, or Reckless Indifference" by Trading Technologies that Could Support a Punitive Damages Award**

In arguing for the right to seek punitive damages at trial, OHL attempts the same ploy it uses to pursue an award of attorneys' fees. Namely, it relies upon the alleged wrongdoing of Widerhorn and Giedraitis when they were the only defendants in the case to support its theory of recovery. (Resp. at 7-8.) This argument fails as a matter of law.

Under Delaware law, the "factual predicate for punitive damages," whether it be outrageous conduct, evil motive, or reckless indifference, "must be attributable to the conduct of the charged party." *Premcor Refining Grp., Inc. v. Matrix Serv. Indus. Contractors, Inc.*, 2008 WL 2232641, at *9 (Del. Super. May 7, 2008). Thus, conduct attributable to a defendant vicariously through the actions of a joint tortfeasor, *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 2007 WL 1991179, at *6 (Del. Super. June 19, 2007), or even a predecessor corporation in certain circumstances, *Sheppard v. A.C. & S. Co.*, 484 A.2d 521, 525-26 (Del. Super. 1984), is insufficient.

Here, any violation of the TRO requiring proper statutory notice to shareholders is attributable to Widerhorn and Giedraitis, the directors of Neurensic who were expressly bound by it. *See Blockowicz v. Williams*, 675 F. Supp. 2d 912, 914 (N.D. Ill. 2009) (district courts "may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law") (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945)). Under the law, Trading Technologies' purported role in the alleged violation of a court order directed at other defendants and entered before Trading Technologies even became a party cannot sustain a prayer for exemplary damages.

Moreover, as set forth in Trading Technologies' fourth motion in limine, OHL's contention that the Court's TRO was violated is factually incorrect, and OHL should be precluded from referencing the TRO at trial, as it will get the parties and the Court bogged down in an irrelevant sideshow. Despite the outrage OHL professes, Kenneth Chu of OHL was on Neurensic's Board of Directors in September and October 2017 and was fully aware of all the actions OHL now claims violated the TRO. OHL knew, for example, about the hiring of Jay Biondo, Morgan Trinkaus, and Eric Eckstrand after the TRO was entered and before the asset sale, yet OHL never ran into Court claiming that an order had been violated, or even emailed Neurensic's other directors to complain that the hirings were improper. Punitive damages are reserved for egregious, highly offensive conduct that is indicative of an evil motive. OHL has not come even close to identifying conduct on Trading Technologies' part that meets this description. Accordingly, OHL should be precluded from seeking punitive damages at trial.

**IV.     OHL Has No Basis to Present a Disgorgement Theory at Trial**

Finally, OHL has no basis for seeking disgorgement of profits from Trading Technologies at trial. OHL concedes that it never divulged the calculation or amount of any disgorgement remedy it intends to pursue. Nonetheless, OHL attempts to fault Trading Technologies for its failure to

7

provide such a calculation, claiming that it "repeatedly requested" information from Trading Technologies during discovery that could have supported a disgorgement claim. (Resp. at 8-9.) This contention is baseless.

First, Trading Technologies fully complied with its discovery obligations in this case, and if OHL believed otherwise, it could have filed a motion to compel. The time for doing so has long passed. *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 332 (N.D. Ill. 2005) ("motions to compel filed after the close of discovery are almost always deemed untimely").

Second, OHL's speculation that "there is reason to believe that Trading Technologies has already prepared an analysis of the SCORE product's profitability" in connection with a recent company sale is factually incorrect. (Resp. at 8 n.1.) No such profitability analysis exists and, even if it did, it would be inappropriate for the Court to re-open discovery to require its production at this time. Perhaps recognizing this, OHL does not even ask the Court to do so.

Third, OHL's position that Trading Technologies' argument is "premature" because OHL's entitlement to disgorgement "depends entirely on the evidence it[] obtains and presents at trial" (Resp. at 8-9) reflects a stunning misapprehension of how civil litigation is supposed to work. Plaintiffs do not get to develop and present undisclosed damages calculations for the first time at trial. *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005) (affirming denial of request to amend damage disclosures where prior failure to timely disclose "was neither justified nor harmless" and where plaintiff "had ample opportunity to submit damages calculations that matched the remaining theory, but [] failed to do so"). If OHL disagreed with Trading Technologies' objections during discovery or believed Trading Technologies' document production to be deficient, OHL could have met and conferred and, if necessary, filed a motion. The Court should reject OHL's suggestion that Trading Technologies is putting "the cart before

8

the horse" (Resp. at 9) by insisting that OHL be allowed to present at trial only those damages theories and calculations it disclosed during discovery, consistent with its interrogatory answers and the Federal Rules.

Finally, OHL misconstrues controlling case law in arguing that it is entitled to pursue a disgorgement theory and still have its aiding and abetting claim tried to a jury. The case law cited by both Trading Technologies and OHL is clear on this point. Generally speaking, when plaintiffs bring equitable claims seeking legal relief (like damages) they are entitled to a jury trial, and when they bring equitable claims seeking equitable relief (like disgorgement) they are not. (*See* Mot. at 8 n.3.) What *Client Funding Solutions Corp. v. Crim* (cited by both parties) and *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC* (cited by Trading Technologies) address is what to do when the parties seek both legal and equitable relief for a legal claim.

In analyzing cases where plaintiffs sought the exact same combination of relief OHL intends to seek here—legal remedies of compensatory and punitive damages and an equitable remedy of disgorgement—both courts found that the addition of the disgorgement remedy rendered the claims more equitable than legal in nature, such that the Court (and not a jury) had to decide them. *See Client Funding Sols. Corp. v. Crim*, 943 F. Supp. 2d 849, 858 (N.D. Ill. 2013); *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 2018 WL 723223, at *2 (N.D. Ill. Feb. 6, 2018). Although the *Client Funding* court noted that the judge and the jury might need to resolve "common factual issues" during a trial that featured an equitable claim for breach of fiduciary duty and other legal claims, the court was clear that issues that "pertain exclusively to the breach of fiduciary duty claim" are "not … relevant to the jury's fact-finding duties." 943 F. Supp. 2d at 859. And in *Continental Vineyard LLC v. Dzierawski* (cited by OHL), the court held that a jury could decide the breach of fiduciary duty claim at issue because it was a "claim for damages," having

9

earlier found that the court could not award plaintiff disgorgement. 2018 WL 11195945, at *1-2 (N.D. Ill. Apr. 5, 2018).

In short, OHL's unexpected decision to pursue a disgorgement theory fundamentally changes both the nature of its claim and who should decide it. But in any event, for reasons set forth above, the Court should preclude OHL from seeking the remedy of disgorgement at trial.

## CONCLUSION

For the foregoing reasons as well as those contained in its Motion to Preclude Windfall Damages and Other Relief, Trading Technologies respectfully requests that the Court enter an order precluding OHL from recovering windfall damages, attorneys' fees, punitive damages, and disgorgement at the trial of this matter.

Dated: September 20, 2022

Respectfully submitted,

**TRADING TECHNOLOGIES INTERNATIONAL, INC.**

By: */s/ David J. Doyle*
    One of its attorneys

David J. Doyle
Dylan Smith
Kirk Watkins
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
ddoyle@freeborn.com
dsmith@freeborn.com
kwatkins@freeborn.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 20, 2022, he caused a true and correct copy of the foregoing document to be filed via the Court's Electronic Case Filing (ECF) system and thereby served on counsel of record.

s/ David J. Doyle
*Counsel for Defendant Trading
Technologies International, Inc.*
